UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
(BROOKLYN)

| | |
|---|---|
| IN RE: EXACTECH POLYETHYLENE ORTHOPEDIC PRODUCTS LIABILITY LITIGATION | MDL No. 3044 (NGG) (MMH) |
| | Case No.: 1:22-md-03044-NGG-MMH |
| | District Judge Nicholas G. Garaufis |
| | Magistrate Judge Marcia M. Henry |

_____/

**THIS DOCUMENT RELATES TO:**

1:23-cv-04310 - Laura and Gregg Grandis

_____

PLAINTIFFS'    **SHORT FORM COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff(s) files this Short Form Complaint and Demand for Jury Trial against the Defendants named below. Plaintiff(s) incorporates by reference the allegations, Causes of Action, and requested relief contained in the Amended Master Personal Injury Complaint filed in *In re: Exactech Polyethylene Orthopedic Products Liability Litigation,* MDL No. 3044, Case No. 1:22-md-03044 ("Amended Master Personal Injury Complaint" or "AMPIC").[1]

Plaintiff(s) further alleges as follows:

**I.    IDENTIFICATION OF PARTIES**

   **A.    PLAINTIFF(S)**

1.    Injured Plaintiff(s): Name of the individual(s) implanted with and injured by an Exactech Device.

Laura Grandis

_____

("Plaintiff(s)")

---

[1] Plaintiff may assert additional causes of action and/or name Defendants not otherwise set forth in the Amended Master Personal Injury Complaint. If additional causes of action are asserted and/or new Defendants named, the specific facts supporting any such additional cause of action or the naming of such additional Defendants must be pled in a manner complying with the Federal Rules of Civil Procedure. Additional pages may be attached to this Short Form Complaint, if necessary.

2. At the time of the filing of this Short Form Complaint, Plaintiff resides in the following state:

SC
_____

3. *Consortium Plaintiff(s):* Name of the individual(s) that alleges damages for loss of consortium:

Gregg Grandis

_____
("Consortium Plaintiff")

4. *Survival and/or Wrongful Death Claims:*

a. *Representative Plaintiff:* Name of the individual filing this matter and their representative capacity (i.e. administrator or executor of estate):

N/A

_____
("Representative Plaintiff")

b. Name and state of residence of Decedent Plaintiff when he/or she died as a result of an Exactech Device related injury:

_____

c. Decedent Plaintiff died on the following date:

_____

**B. DEFENDANTS**

BEFORE PROCEEDING – PLEASE CAREFULLY READ AND CONSIDER THE PLACES OF INCORPORATION, PRINCIPAL PLACE OF BUSINESS, AND/OR CITIZENSHIP OF EACH DEFENDANT BEFORE SELECTING TO ENSURE THAT YOU ARE NOT NAMING ANY DEFENDANTS FROM THE SAME STATE AS ANY PLAINTIFF. THE PLACE OF INCORPORATION, PRINCIPAL PLACE OF BUSINESS, OR RESIDENCE OF EACH DEFENDANT IS IN THE FOOTNOTES FOR YOUR CONVENIENCE

5. Plaintiff(s) names the following Defendants in this action:

**Exactech Defendants**

    ☐   Exactech, Inc.[2]

    ☑   Exactech U.S., Inc.[3]

**TPG Defendants**

**NOTE:  Pursuant to Practice and Procedure Order No. 4 (Direct Filing Order as to TPG Entity Defendants), these entities may *only* be named as a defendant in an action DIRECTLY FILED in this Court -- as opposed to an action filed in another court and transferred to this Court via the MDL statute, 28 U.S.C. § 1407 -- if implantation of a device(s) identified in paragraphs 8, 15, 22 or 29 below occurred *on or after February 14, 2018* (i.e., the date identified in response to paragraphs 10, 17, 24, 31 below); otherwise, identifying one or more of the TPG Defendants below will be of no effect and it/they will NOT be a defendant in the action.**

    ☐   TPG Inc.[4]

    ☐   Osteon Holdings, Inc.[5]

    ☐   Osteon Merger Sub, Inc.[6]

    ☐   Osteon Intermediate Holdings II, Inc.[7]

**Other Defendant(s)** (provide name and state(s) of citizenship for each new Defendant)

Ian Gradisar, M.D. - Ohio
Crystal Clinic Orthopaedic Center LLC - Ohio
Crystal Clinic, Inc. - Ohio

---

[2] Florida corporation, with its principal place of business in Gainesville, Florida, and a citizen of Florida.
[3] Florida corporation, with its principal place of business in Gainesville, Florida, and a citizen of Florida.
[4] Delaware corporation, with its principal place of business in Fort Worth, Texas, and a citizen of Delaware and Texas.
[5] Delaware corporation, with its principal place of business in Delaware, and a citizen of Delaware.
[6] Texas corporation, with its principal place of business in Florida, and a citizen of Texas and Florida.
[7] Delaware corporation, with its principal place of business in Delaware, and a citizen of Delaware.

## II.    <u>JURISDICTION</u>

6.  The Court has jurisdiction over this matter pursuant to:

☑ Diversity of Citizenship

☐ Other (any additional basis for jurisdiction must be pled in sufficient detail below or on appended pages as required by the applicable Federal Rules of Civil Procedure):

_____

## III.    <u>VENUE / DESIGNATED FORUM</u>

7.  Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing:

U.S. District Court - Northern District of Ohio - Eastern Division (Akron)

_____

## IV.    <u>PLAINTIFF'S EXACTECH DEVICE AND INJURIES</u>

**<u>Exactech Device 1:</u>**

**(NOTE: Answer the following questions for only one Exactech Device.)**

8.  Plaintiff was implanted with the following Exactech Device:

| **<u>Exactech Hip Devices</u>** | | **<u>Exactech Knee Devices</u>** | |
|---|---|---|---|
| ☐ | Connexion GXL | ☐ | Optetrak |
| ☐ | Novation GXL | ☑ | Optetrak Logic |
| ☐ | AcuMatch GXL | ☑ | Truliant |
| ☐ | MCS GXL | | |

**<u>Exactech Ankle Device</u>**

☐ Vantage

9.  Leg in which the Exactech Device was Implanted:

☐  Right

☑  Left

10. Date the Exactech Device was implanted (see also note to paragraph 5 above):

Nov ___ 30 ___ 2020 ___

11. State in which the Exactech Device was implanted:

OH ___

12. Date the Exactech Device was surgically removed/revised:

Jul ___ 26 ___ 2021 ___

13. Plaintiff has suffered the following injuries and complications as a result of this Exactech Device:

swelling, excruciating pain, clicking and giving out, inability to walk without a cane or walker, use of medication to manage the pain. Plaintiff eventually had two revision surgeries completed.

14. Is Plaintiff asserting claims regarding injuries suffered **prior to** February 14, 2018 against the TPG Defendants?

Yes ☐  No ☑

**Exactech Device 2:**

**(NOTE: Answer the following questions for only one Exactech Device.)**

15. Plaintiff was implanted with the following Exactech Device:

| **Exactech Hip Devices** | **Exactech Knee Devices** |
|---|---|
| ☐ Connexion GXL | ☑ Optetrak |
| ☐ Novation GXL | ☑ Optetrak Logic |
| ☐ AcuMatch GXL | ☑ Truliant |
| ☐ MCS GXL | |

**Exactech Ankle Device**

☐ Vantage

16. Leg in which the Exactech Device was Implanted:

☐ Right

☑ Left

17. Date the Exactech Device was implanted (see also note to paragraph 5 above):

Jul        26        2021

18. State in which the Exactech Device was implanted:

OH

19. Date the Exactech Device was surgically removed/revised:

Dec        5        2022

20. Plaintiff has suffered the following injuries and complications as a result of this Exactech Device:

Swelling, excruciating pain including pain in her right hip and right knee, inability to sleep and anxiety, reduced ability to walk, pain while traveling for work, clicking in the knee. Plaintiff eventually had two revision surgeries completed.

---

21. Is Plaintiff asserting claims regarding injuries suffered **prior to** February 14, 2018 against the TPG Defendants?

Yes ☐ No ☑

**Exactech Device 3:**

**(NOTE: Answer the following questions for only one Exactech Device.)**

22. Plaintiff was implanted with the following Exactech Device:

| **Exactech Hip Devices** | **Exactech Knee Devices** |
|---|---|
| ☐ Connexion GXL | ☐ Optetrak |
| ☐ Novation GXL | ☐ Optetrak Logic |
| ☐ AcuMatch GXL | ☐ Truliant |
| ☐ MCS GXL | |

**Exactech Ankle Device**

☐ Vantage

23. Leg in which the Exactech Device was Implanted:

☐ Right

☐ Left

24. Date the Exactech Device was implanted (see also note to paragraph 5 above):

_____

25. State in which the Exactech Device was implanted:

_____

26. Date the Exactech Device was surgically removed/revised:

_____

27. Plaintiff has suffered the following injuries and complications as a result of this Exactech Device:

_____

28. Is Plaintiff asserting claims regarding injuries suffered **prior to** February 14, 2018 against the TPG Defendants?

Yes ☐  No ☐

**Exactech Device 4:**

**(NOTE: Answer the following questions for only one Exactech Device.)**

29. Plaintiff was implanted with the following Exactech Device:

| **Exactech Hip Devices** | **Exactech Knee Devices** |
|---|---|
| ☐ Connexion GXL | ☐ Optetrak |
| ☐ Novation GXL | ☐ Optetrak Logic |
| ☐ AcuMatch GXL | ☐ Truliant |
| ☐ MCS GXL | |

**Exactech Ankle Device**

☐ Vantage

30. Leg in which the Exactech Device was Implanted:

☐ Right

☐ Left

31. Date the Exactech Device was implanted (see also note to paragraph 5 above):

_____

32. State in which the Exactech Device was implanted:

_____

33. Date the Exactech Device was surgically removed/revised:

_____

34. Plaintiff has suffered the following injuries and complications as a result of this Exactech Device:

_____

35. Is Plaintiff asserting claims regarding injuries suffered **prior to** February 14, 2018 against the TPG Defendants?

Yes ☐ No ☐

**Exactech Device 5:**

**(NOTE: Answer the following questions for only one Exactech Device.)**

36. Plaintiff was implanted with the following Exactech Device:

**Exactech Hip Devices**

☐ Connexion GXL
☐ Novation GXL
☐ AcuMatch GXL
☐ MCS GXL

**Exactech Knee Devices**

☐ Optetrak
☐ Optetrak Logic
☐ Truliant

**Exactech Ankle Device**

☐ Vantage

37. Leg in which the Exactech Device was Implanted:
☐ Right
☐ Left

38. Date the Exactech Device was implanted (see also note to paragraph 5 above):

_____

39. State in which the Exactech Device was implanted:

_____

40. Date the Exactech Device was surgically removed/revised:

_____

41. Plaintiff has suffered the following injuries and complications as a result of this Exactech Device:

_____

42. Is Plaintiff asserting claims regarding injuries suffered **prior to** February 14, 2018 against the TPG Defendants?

Yes ☐   No ☐

**NOTE: If Plaintiff(s) alleges injuries related to additional Exactech Devices not already identified in this Short Form Complaint, please complete questions 36-42 separately for each additional Exactech Device and attach to this Short Form Complaint.**

V.    <u>**CAUSES OF ACTION**</u>

43. As to Exactech, Inc., Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☐    First Cause of Action: Strict Liability – Manufacturing Defect

☐    Second Cause of Action: Strict Liability – Design Defect

☐    Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☐    Fourth Cause of Action: Negligence

☐    Fifth Cause of Action: Breach of Express Warranty

☐    Sixth Cause of Action: Breach of Implied Warranty

☐    Seventh Cause of Action: Negligent Misrepresentation

☐    Eighth Cause of Action: Fraud

☐    Ninth Cause of Action: Fraudulent Concealment

☐    Tenth Cause of Action: Punitive Damages

☐    Eleventh Cause of Action: Loss of Consortium

☐    Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

44. As to Exactech U.S., Inc., Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☑ First Cause of Action: Strict Liability – Manufacturing Defect

☑ Second Cause of Action: Strict Liability – Design Defect

☑ Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☑ Fourth Cause of Action: Negligence

☑ Fifth Cause of Action: Breach of Express Warranty

☑ Sixth Cause of Action: Breach of Implied Warranty

☑ Seventh Cause of Action: Negligent Misrepresentation

☑ Eighth Cause of Action: Fraud

☑ Ninth Cause of Action: Fraudulent Concealment

☑ Tenth Cause of Action: Punitive Damages

☑ Eleventh Cause of Action: Loss of Consortium

☑ Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

Negligence per se, unjust enrichment,

45. As to TPG, Inc. Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☐ First Cause of Action: Strict Liability – Manufacturing Defect

☐ Second Cause of Action: Strict Liability – Design Defect

☐ Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☐ Fourth Cause of Action: Negligence

☐ Fifth Cause of Action: Breach of Express Warranty

☐ Sixth Cause of Action: Breach of Implied Warranty

☐ Seventh Cause of Action: Negligent Misrepresentation

☐ Eighth Cause of Action: Fraud

☐ Ninth Cause of Action: Fraudulent Concealment

☐ Tenth Cause of Action: Punitive Damages

☐ Eleventh Cause of Action: Loss of Consortium

☐ Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

46. As to Osteon Holdings, Inc., Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☐ First Cause of Action: Strict Liability – Manufacturing Defect

☐ Second Cause of Action: Strict Liability – Design Defect

☐ Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☐ Fourth Cause of Action: Negligence

☐ Fifth Cause of Action: Breach of Express Warranty

☐ Sixth Cause of Action: Breach of Implied Warranty

☐ Seventh Cause of Action: Negligent Misrepresentation

☐ Eighth Cause of Action: Fraud

☐ Ninth Cause of Action: Fraudulent Concealment

☐ Tenth Cause of Action: Punitive Damages

☐ Eleventh Cause of Action: Loss of Consortium

☐ Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

47. As to Osteon Merger Sub, Inc., Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☐   First Cause of Action: Strict Liability – Manufacturing Defect

☐   Second Cause of Action: Strict Liability – Design Defect

☐   Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☐   Fourth Cause of Action: Negligence

☐   Fifth Cause of Action: Breach of Express Warranty

☐   Sixth Cause of Action: Breach of Implied Warranty

☐   Seventh Cause of Action: Negligent Misrepresentation

☐   Eighth Cause of Action: Fraud

☐   Ninth Cause of Action: Fraudulent Concealment

☐   Tenth Cause of Action: Punitive Damages

☐   Eleventh Cause of Action: Loss of Consortium

☐   Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

48. As to Osteon Intermediate Holdings II, Inc., Plaintiff(s) adopts the following Causes of Action asserted in the Amended Master Personal Injury Complaint and the allegations and Prayer for Relief with regard thereto, as set forth therein:

☐    First Cause of Action: Strict Liability – Manufacturing Defect

☐    Second Cause of Action: Strict Liability – Design Defect

☐    Third Cause of Action: Strict Liability – Defect Due to Inadequate Warnings or Instructions

☐    Fourth Cause of Action: Negligence

☐    Fifth Cause of Action: Breach of Express Warranty

☐    Sixth Cause of Action: Breach of Implied Warranty

☐    Seventh Cause of Action: Negligent Misrepresentation

☐    Eighth Cause of Action: Fraud

☐    Ninth Cause of Action: Fraudulent Concealment

☐    Tenth Cause of Action: Punitive Damages

☐    Eleventh Cause of Action: Loss of Consortium

☐    Other: Plaintiff(s) may assert additional theories and/or Causes of Action. If Plaintiff(s) includes additional theories and/or Causes of Action, the specific facts and allegations supporting additional theories and/or Causes of Action must be pleaded by Plaintiff in sufficient detail as required by the Federal Rules of Civil Procedure. Attach additional pages to this Short Form Complaint, if necessary.

49. As to any Defendant named in this Short Form Complaint that is not named in the Amended Master Personal Injury Complaint, Plaintiff(s) asserts the following allegations, causes of action, and prayer for relief. Attach additional pages to this Short Form Complaint, if necessary.

Medical malpractice against Defendant Granisar, Negligence against Defendants Gradisar and Crystal Clinic, Negligent Misrepresentation against Defendants Gradisar and Crystal Clinic, Negligent Per Se against Defendants Gradisar and Crystal Clinic, Constructive Fraud against Defendants Gradisar and Crystal Clinic, Fraud against Defendants Gradisar and Crystal Clinic, Unjust Enrichment against Defendants Gradisar and Crystal Clinic, Vicarious Liability / Respondeat Superior against Defendant Crystal Clinic, Loss of Consortium and Services against Defendants Gradisar and Crystal Clinic.   Plaintiff's originally filed Complaint, time stamped 2/7/23, is attached hereto and incorporated herein by reference, as Exhibit A.

---

**WHEREFORE**, Plaintiff(s) prays for relief and judgment against named Defendants and all such further relief that this Court deems equitable and just as set forth in the Amended Master Personal Injury Complaint and any additional relief to which Plaintiff(s) may be entitled.

## <u>JURY DEMAND</u>

Plaintiff(s) hereby demands a trial by jury as to all claims in this action.

Date: Jun          30          2023

Signed: /s/ Thomas J. Connick

Signature block: Thomas J. Connick, Esq. (OH 0070527)
Schneider Smeltz Spieth Bell LLP
1375 East Ninth Street Suite 900
Cleveland OH  44114
(216) 696-4200
tconnick@sssb-law.com

**COURT OF COMMON PLEAS**
**SUMMIT COUNTY, OHIO**

| | |
|---|---|
| LAURA GRANDIS<br>181 Apple Orchard Road<br>Central, SC  29630<br><br>And<br><br>GREGG GRANDIS<br>181 Apple Orchard Road<br>Central, SC  29630<br><br>                    Plaintiffs,<br>        v.<br><br>EXACTECH, US, INC.<br>C/O Corporation Service Company<br>Statutory Agent<br>3366 Riverside Dr., #103<br>Upper Arlington, OH  43221<br><br>And<br><br>IAN GRADISAR, M.D.<br>3975 Embassy Parkway<br>Akron, OH  44333<br><br>And<br><br>CRYSTAL CLINIC ORTHOPAEDIC<br>CENTER, LLC.<br>3975 Embassy Parkway<br>Akron, OH  44333<br><br>CRYSTAL CLINIC, INC.<br>c/o Ronald R. Suntken, Statutory Agent<br>3975 Embassy Parkway<br>Akron OH  44333<br><br>                    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br>JUDGE<br><br>***CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES WITH JURY DEMAND***<br><br>***1.  MEDICAL MALPRACTICE***<br><br>***2.  STRICT LIABILITY MANUFACTURING DEFECT***<br><br>***3.  STRICT LIABILITY DESIGN DEFECT***<br><br>***4.  STRICT LIABILITY FAILURE TO WARN***<br><br>***5.  NEGLIGENCE***<br><br>***6.  NEGLIGENT MISREPRESENTATION***<br><br>***7.  NEGLIGENCE PER SE***<br><br>***8.  BREACH OF EXPRESS WARRANTY***<br><br>***9.  BREACH OF IMPLIED WARRANTY***<br><br>***10. PROFESSIONAL NEGLIGENCE/ BREACH OF FIDUCIARY DUTY***<br><br>***11. CONSTRUCTIVE FRAUD***<br><br>***12. FRAUD (MISREPRESENTATION; FRAUDULENT CONCEALMENT)***<br><br>***13. UNJUST ENRICHMENT***<br><br>***14. VICARIOUS LIABILITY***<br><br>***15. LOSS OF CONSORTIUM***<br><br>***16. MEDICAL NEGLIGENCE (INFORMED CONSENT)*** |



EXHIBIT

**A**

1

NOW COMES Plaintiffs Laura Grandis ("Plaintiff" or "Grandis") and Gregg Grandis, (hereafter sometimes referred to collectively as "Plaintiffs"), by and through their undersigned attorneys, and bring this action against Exactech, Inc. ("Exactech"), Exactech US, Inc. ("Exactech US"), Ian Gradisar, M.D., ("Gradisar"), and Crystal Clinic, Inc. ("Crystal") (hereafter sometimes collectively referred to as "Defendants"), for, among other causes of action, product liability, medical malpractice and fraud related to damages suffered as a proximate result of the manufacture, sale, supply, prescription and implantation of a Truliant Total Knee System ("Truliant Device") and the Optetrak Comprehensive Total Knee System ("Optetrak Device"). Grandis brings this action, individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

## JURISDICTION & VENUE

1.     Venue is proper in Summit County, Ohio, pursuant to Ohio Civ. R. Proc. 3(C)(3) and (6) because Defendants engaged in conduct in Summit County causing Plaintiffs' injuries and economic damages, and the facts giving rise to the claims, including injunctive and declaratory relief, are the subject matter of this Complaint all of which occurred in Summit County, Ohio.

## THE PARTIES

2.     Plaintiff Laura Grandis is a resident and citizen of Central, South Carolina. At all times relevant to this action, Plaintiff Gregg Grandis is the lawful and loving spouse to Plaintiff Laura Grandis.

3.     Defendant Exactech, Inc. is a foreign for-profit corporation licensed, registered and authorized through the Ohio Secretary of State to conduct business in the State of Ohio and has its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

4.     Defendant Exactech, Inc. develops, manufactures, packages, stores, distributes,

2

markets and sells orthopedic implant devices, including Truliant and Optetrak Total Knee Replacement ("TKR") Devices and related surgical instrumentation throughout the United States, including in and throughout the United States and the State of Ohio.

5.     Defendant Exactech, Inc. manufactured the Optetrak TKR Device implanted in Plaintiff Laura Grandis.

6.     Defendant Exactech, Inc. manufactured the Truliant TKR Device implanted in Plaintiff Laura Grandis.

7.     At all times relevant to this action, Defendant Exactech, Inc. tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices in interstate commerce and throughout the State of Ohio and generated substantial revenue as a result.

8.     Defendant Exactech US, Inc., is a wholly owned subsidiary of Defendant Exactech, Inc., and is a foreign for-profit corporation licensed, registered and authorized through the Ohio Secretary of State to conduct business in the State of Ohio and has its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

9.     According to public filings, Defendant Exactech US, Inc., conducts Defendants' U.S. sales and distribution activities.

10.     Exactech US, Inc. is engaged in the business of designing, developing, testing, assembling, selecting, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing Defendants' products, including the Optetrak and Truliant Devices, into commerce throughout the United States and the State of Ohio, and generated substantial revenue as a result.

11.     Upon information and belief, the Truliant and Optetrak Devices manufactured by

3

Defendant Exactech, Inc. were distributed by Defendant Exactech US, Inc. throughout the United States, including to Plaintiff and the Class Members in Ohio, where Plaintiff Laura Grandis received her implants.

12.     Defendant Ian Gradisar, M.D. ("Gradisar") is a citizen of the State of Ohio, duly licensed to practice medicine in the State of Ohio, is an employee and Board Member of Crystal Clinic Orthopedic Center, was Plaintiff's treating surgeon and physician related to the allegations asserted herein and holds himself out as a physician as he receives and treats patients for consideration.

13.     Defendant Crystal Clinic Orthopedic Center ("Crystal") is a business entity and/or other legal entity duly organized and existing pursuant to the laws of the State of Ohio, and operated health care facilities located in Summit County, Ohio and holds itself out as a provider of medical care services to the public including Plaintiff and the Class Members. At all times relevant herein, Crystal employed physicians, nurses, and other personnel to evaluate, care for and treat patients; and the acts and omissions performed by employees, servants, or agents of Crystal were within the scope of their express, implied or apparent authority as agents of Crystal.

## ALLEGATIONS COMMON TO ALL CLAIMS

14.     This is an action for damages, economic harm and injunctive and declaratory relief relating to the Exactech Defendants' development, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distribution, marketing, supplying, storage, and/or selling of the Truliant Device and Optetrak Device, and medical and professional negligence, fraud, constructive fraud, misrepresentation and unjust enrichment committed by Gradisar and Crystal related to their concealed conflict of interest and, business and financial relationship with Exactech leading to Gradisar's and Crystal's systemically prescribing, recommending, supplying and implanting the Truliant and Optetrak devices to patients, such as Grandis, that they knew and/or

4

CV-2023-02-0416    TOWELL, JENNIFER D    02/07/2023 10:08:41 AM    CMCO    Page 5 of 81

should have known were defective, failing, mislabeled and/or adulterated under FDA regulations, while failing to disclose their economic and business relationship with Exactech and/or obtain the required informed consent of their patients, such as Grandis, that placed their own economic incentives benefits above the best interests of their patients, such as Grandis and the putative Class Members.

15.    Exactech obtained 510(k) clearance from the Food and Drug Administration ("FDA") for its various TKR devices and components.

16.    510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

17.    510(k) clearance only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

18.    Upon information and belief all the component parts comprising Plaintiff's Truliant and Optetrak Devices were cleared for marketing by the FDA pursuant to 510(k) process or were marketed without receiving either 510(k) clearance or PMA approval by the FDA.

19.    The Optetrak Device is classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis. It features a mix of polyethylene and metal-based components.

20.    According to Exactech, the device "introduces novel implants and instruments to make the total knee procedure, easier, faster and more consistent, improving patient satisfaction for

Sandra Kurt, Summit County Clerk of Courts

a more diverse population requiring total knee replacements."

21.    The Optetrak Device is comprised of the following parts: a patellar cap, femoral cap, tibial insert and tibial tray. The patellar cap and tibial insert are made of polyethylene. Exactech touted the Optetrak Device as being first-in-class in their product brochures.

22.    In their marketing materials, the Defendants promised that the Optetrak Device had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

23.    Defendants promoted their Optetrak Devices as a system with nearly three decades of clinical success and proven outcomes for patients around the world because of an improved articular design resulting in low polyethylene stresses.

24.    However, the Optetrak Devices have performed poorly when compared to its competitors. For example, the Australian Orthopaedic Association, a preeminent, internationally recognized orthopedic implant registry, has identified the Optetrak Device as an implant with a *higher-than-expected rate of revision*.

25.    According to the 2020 Australian National Joint Replacement Registry, the rate of revision for a total knee replacement utilizing an Optetrak tibial component with a Optetrak-CR femoral component was 8.5% at ten years and 10.2% at ten years when implanted with a Optetrak-PS femoral component which far exceeds international guidelines for accepted revision rates.

26.    Per the recommendations established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak Devices do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark."

27.    At all times relevant, Defendants have been aware of a high rate of early failures associated with the Optetrak Device. For several years, Defendants have known that the Truliant

6

Device and Optetrak Devices were prone to fail years before their expected life. In particular, the Optetrak Device suffers early failure in its "tibia tray." The TKR system involves implanting into a patient a "tibia tray," a component which is anchored to the patient's tibia and connects to the mechanical knee. A patient's first TKR surgery is called a Primary Knee Replacement or "Primary TKR." If a patient experiences a problem with the Primary TKR device or procedure, the patient may be required to undergo a revision surgery called a "Revision TKR," which is more complex and involves a larger, heavier implant.

28.    One reason a Primary TKR device fails and requires a revision surgery is, such as related to the alleged failure that forms this action, is when the metal device inserted into the patient's tibia becomes loose and begins to wobble; this is known as "tibial loosening," causing pain and immobility.

29.    Until 2011, Exactech had only two options for tibia trays within its Optetrak product line: (1) the defective Finned Tibia Tray[1], used in Primary TKR's, and (2) the "Trapezoid" Tray, used in the revision system. As early as 2005 Defendants knew that multiple doctors were experiencing a very high number of revisions related to the Optetrak Finned Tibia Trays.

30.    No later than 2008, Exactech learned that the Finned Tibia Tray failed in approximately 30-35% of patients within the first three years of implantation. This failure rate is ten times the failure rate of comparable knee replacement devices and six times the failure rate at which a device should be voluntarily recalled. The Tibia Tray failures involved tibial loosening, causing pain and immobility and necessitating a Revision TKR to remedy the failure.

31.    As a result of these defects, patients that have had the Optetrak Device implanted

---

[1] Exactech designed, developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, warranted and/or sold Optetrak tibial trays with a design Exactech referred to as "finned."

Sandra Kurt, Summit County Clerk of Courts

have endured and/or will continue to endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation, causing damage or death to surrounding tissue and bone; and a subsequent and more difficult (and sometimes multiple) revision surgeries to replace the faulty Optetrak Device, giving rise to still more debilitation, a prolonged recovery time, and increased risk of complications from surgery.

32.     After receiving multiple reports about Finned Tibia Tray failures, Exactech began holding investigatory meetings. By 2008, Defendants had notice that the Optetrak Device was failing at a rate higher than promoted. Reports in the Manufacturer and User Facility Device Experience ("MAUDE")[2] indicate instances of revision due to "loose tibial component," "aseptic loosening," pain and visible loosening," and "pain, limited mobility, knee swelling and sensitivity" due to "loose" joint. These early onset failure mode reports are representative of the increased rate of incidents of which Defendants had become internally aware.

33.     Complaints continued to pour in throughout 2013. For example, there were complaints lodged regarding "tibial loosening" a mere two years post-operation, "revision due to tibial loosening," during revision, the tibial component was found to be loose and easily removed," "revision of knee component due to loosening," "revision due to pain and loosening."

34.     These complaints continued into 2014, including complaints of "revision due to tibial loosening," revision of "finned tibial tray due to tibial loosening," tibial loosening," "revision of Optetrak knee components due to tibial loosening," revision due to pain and loosening," "revision of Optetrak knee components due to tibial loosening," and "revision of Optetrak knee components reportedly due [to] aseptic loosening."

35.     Instead of warning consumers about the increased failure rates with its finned Optetrak Devices, Exactech engaged in a "silent recall" campaign where it slowly replaced all

---

[2] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm.

8

finned tibial trays with a new more substantial design, referred to as "fit" trays. Concurrent with this strategy of product replacement, Exactech also engaged in a campaign of misinformation where any incidents of early onset failure were blamed on surgeon specific factors instead of admitting any issues with the finned product itself. Upon information and belief and given their relationship with Exactech as well as their relationship with other Exactech representatives and agents, including Dr. Ivan Gradisar[3], Defendants Gradisar and Crystal were also aware of this false and misleading narrative.

36.    In 2015 Exactech raked in over $241 million dollars in sales across all product lines.[4] And, in its 2015 Form 10-K, Exactech represents that "to better meet the demand for revision surgeries, we began the initial launch of a new revision knee system in 2015."[5] Of the more than $241 million in sales, knee device sales accounted for over $70 million in sales, or 29.3% of all Exactech's sales in 2015.[6]

37.    Manuel Fuentes ("Fuentes") is a physician who was employed by Exactech from 2006 to 2011. In early 2008, during a meeting attended by Fuentes and leading engineers, product managers, and executives within Exactech, Exactech's Director of Marketing proposed that Exactech issue a recall, pull the Finned Tibia Tray inventory from the market, and replace it with the Trapezoidal Tray. At this meeting, Jody Phillips, Exactech's CFO, responded that recalling the Finned Tibia Tray was not an option because it would be too financially detrimental, explaining that Exactech was drowning in Finned Tibia Tray inventory and the company could not afford to absorb the inventory cost. Phillips stated that if Exactech recalled the Finned Tray, the financial

---

[3] Dr. Ivan Gradisar is Defendant Gradisar's father, a long-time Exactech Consultant and "friend" of Exactech, and one of the founding members of Crystal, and its former President.
[4] See Exactech, Inc. Form 10-k for the fiscal year ending December 31, 2015, http://www.exac.com/resource-library/investors/recent-filings/10-k-annual-report-1.
[5] *Id*. At p. 4.
[6] *Id*.

9

damage to Exactech would be too great and thus disclosure of any kind was not a viable financial option.

38.    Consequently, Exactech decided to neither issue a recall of the Finned Tibia Tray nor disclose any problems related to the Optetrak Device to the FDA, Centers for Medicare & Medicaid Services, its surgeon customers (except for Defendants Gradisar and Crystal as further outlined herein), their patients, or the Department of Justice. Instead, Exactech hired Dr. Ivan Gradisar to audit patient outcomes regarding the Finned Tibia Tray. Dr. Gradisar's audit report concluded that out of 47 patients receiving a TKR revision between January 1, 2007, and March 31, 2008, 12 required revision due to tibial loosening from a failed Finned Tibia Tray implant. Thus, roughly 25% of the revisions audited by Dr. Gradisar over the 15-month period were attributable to tibial loosening. Dr. Gradisar supplemented his audit report, informing Exactech that two surgeons in his practice, Dr. Phil Lewandowski[7] and Dr. Kenneth Green, had previously performed additional revisions due to tibial loosening in the Finned Tibia Tray. And of course, none of this was ever disclosed to Plaintiff by Gradisar or Crystal.

39.    In 2014, Dr. David Lemak saw multiple patients with tibial loosening problems following their Primary TKRs with the Finned Tibia Tray. By late 2017, Dr. Lemak had to perform 55 revision surgeries on patients who had been implanted with the Finned Tibia Tray. At various points spanning from 2014 through 2017, Dr. Lemak expressed to Exactech his dissatisfaction with the extent of the tibial loosening and his concern that there was a problem with the Finned Tibia Tray. At one point, Dr. Lemak expressed that he was likely going to change devices. After this, Exactech offered Dr. Lemak a consultant agreement through their newly created sports medicine department. However, once Dr. Lemak stopped using Exactech's Finned Tibia Tray, Exactech

---

[7] Dr. Lewandowski is an Orthopedic Surgeon at Crystal.

Sandra Kurt, Summit County Clerk of Courts

stopped discussing the consulting agreement with Dr. Lemak.[8]

40.    Exactech increased its revenue in 2016 by 7%, up to $257.6 million with knee device sales increasing 4%.[9] Knee device sales for the fourth quarter of 2016 were $19.8 million.[10] According to Exactech CEO and President David Petty, the increases in knee device revenue "reflect excellent surgeon acceptance of Exactech innovation, including our three new revision systems. Mr. Petty further stated that he anticipates the "revision knee rollout in the fourth quarter" of 2016 will "carry momentum into 2017.""[11]

41.    Despite Exactech's claims in its promotional materials of over 30 years of successful outcomes with knee devices, Defendants knew of an unacceptably high early failure rate of its Optetrak Device.

42.    As stated above, after receiving reports about the Finned Tibia Tray failures, Exactech hired Dr. Ivan Gradisar to audit patient outcomes and develop a better understanding of the tibial loosening problem. Dr. Ivan Gradisar was Crystal Clinic's first president and one of the "founding fathers" of orthopedics in Akron, Ohio.[12]

43.    Dr. Ivan Gradisar was also one of the primary designers of the Optetrak TKR and, as a result, he was viewed as a "friend of the company" and also received significant income through royalties on Optetrak TKR sales. Dr. Ivan Gradisar reviewed patients from an Ohio hospital who had received a revision knee replacement surgery over a seventeen-month period and a fifteen-month period between 2004 and 2008.

---

[8] Upon information and belief these are the same or similar consulting agreements engaged in by Drs. Ivan and Ian Gradisar.
[9] See Exactech, Inc. Form 8-K dated February 21, 2017, http://www.exac.com/resource-library/investors/recent-filings/8-k-current-report-12.
[10] *Id.*
[11] *Id.*
[12] https://medcitynews.com/2010/09/an-orthopedic-surgeon-returns-to-akron-qa-with-ian-gradisar/.

11

44.    Defendant Dr. Ian Gradisar assisted his father in reviewing approximately 40 knees that were revised in 2007 and 2008, and, therefore, had first-hand knowledge of the failing and defective Optetrak device(s). Dr. Ian Gradisar also serves on Crystal's Board of Managers.

45.    Neither Defendant Gradisar nor Crystal disclosed to its patients the business and financial relationship and monetary incentives between them (and other Crystal physicians and agents such as Dr. Ivan Gradisar) and Exactech, or any of the knowledge they had regarding the increased failure rates of the Exactech TKR Devices, at any time relevant to the claims outlined herein, nor did they have any best practices, policies, procedures and/or guidelines in place to provide for such disclosure in order to secure their patients informed consent.

46.    It was not until August 30, 2021 did Exactech take some action and issued a partial recall of all Optetrak All-polyethylene tibial components, including the Optetrak All-polyethylene CC Tibial Components; Optetrak All-polyethylene CR Tibial Components; Optetrak All-polyethylene CR Tibial Sloped Components; Optetrak All-polyethylene PS Tibial Components; Optetrak HI-FLEX PS Polyethylene Tibial Components; Optetrak Logic All-polyethylene CR Tibial Components; Optetrak Logic All-polyethylene CRC Tibial Components; Optetrak Logic All-polyethylene PSC Tibial Components; Optetrak Logic Modular PS Tibial Components; Optetrak Logic RBK PS Tibial Components; Truliant CR Tibial Inserts; Truliant CRC Tibial Inserts; Truliant PS Tibial Inserts; and Truliant PSC Tibial Inserts.

47.    In issuing the August 2021 recall, Exactech stated "inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer."[13]

48.    According to the FDA website, "Exactech began notification to distributors and sales representatives on about 08/30/2021 via letter titled "URGENT MEDICAL DEVICE

---

[13] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRes/res.cfm?ID=189266

12

RECALL." Actions being taken by Exactech included removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags. This will be performed in a phased approach over the next 12 months. Phase 1 includes immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags. Phase 2 includes, between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags." *Id.*

49.    Despite initial communications with distributors and sales representatives, Exactech did not issue any communications (with the exception of Defendants Gradisar and Crystal) to surgeons who had implanted Optetrak Device with a recalled polyethylene component or to patients who had received an Optetrak Device with a recalled polyethylene component until months later in February 2022.

50.    On February 7, 2022, Defendants issued an "Urgent Medical Device Correction" in which it informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or**

13

**component fatigue cracking/fracture, all leading to corrective revision surgery.[14]**

51.     The "Urgent Medical Device Correction" went on to further state that Exactech was expanding the recall to include all knee arthroplasty polyethylene inserts packed in nonconforming bags regardless of label or shelf life. The components subject to the recall now included: Optetrak®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX® PS Tibial Inserts; Optetrak Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; and Truliant®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts. *Id.*

52.     It is estimated that a total of 147,732 inserts implanted in the United States since 2004 were produced with non-conforming packaging. *Id.*

53.     Exactech further acknowledged the original Optetrak Device has shown statistically significant higher overall revision rates compared to other total knee arthroplasties in the Australian, United Kingdom and New Zealand joint registries. *Id.*

54.     Specifically, reasons for revision associated with polyethylene wear, including loosening, lysis, and pain, were increased three-to seven-fold with the Optetrak Device acccording to the 2021 Australian National Joint Replacement Registry with revision diagnoses related to accelerated polyethylene wear possibly related to the non-conforming packaging. *Id.*

55.     Implanting surgeons were advised to contact patients previously implanted with recalled components and to schedule an evaluation if the patient is experiencing any new or worsening knee swelling, pain while walking, inability to bear weight, grinding or other noise, instability, or any new symptoms of clicking in the knee. *Id.*

---

[14] *See* https://www.exac.com/wp-content/uploads/2022/02/Exactech-DHCP letter.02.07.2022.pdf

14

56.    Furthermore, Defendants advised surgeons that revision surgery should be considered for patients who exhibit premature polyethylene wear. *Id.*

57.    Based on Exactechs' own representations, since 2004, Exactech manufactured, promoted, and distributed the Truliant and Optetrak Devices without ensuring the polyethylene components were properly packaged to prevent or minimize oxidation. At no point until August 2021 did Defendants first modify the packaging in an effort to address this defect, nor did Defendants, all of whom had knowledge of these failures, advise and/or warn any patients prior to implanting the Truliant or Optetrak Devices.

58.    At all times relevant to this action, Defendants were aware of the Truliant and Optetrak Devices' propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery and its attendant complications in patients. Nonetheless, Defendants still did not adequately warn patients, the medical community, or the public about these risks, and continued to promote, market, sell, recommend, supply, prescribe, implant and defend the Optetrak Device until August 2021, at which point in time only a partial recall was issued.

59.    At all times relevant to this action, Defendants failed to acknowledge the manufacturing defects in the Truliant and Optetrak Devices due to poor and inadequate quality assurance procedures and due to a wanton and reckless disregard for public safety and in particular the safety of their patients. Defendants also failed to implement or utilize adequate safeguards, tests, inspections, validation, monitoring and quality assessments to ensure the safety of the Optetrak Device.

60.    At the time the Truliant and Optetrak Devices was manufactured and sold to patients, including Plaintiff, the device was defectively manufactured and unreasonably dangerous,

15

and did not conform to the federal regulations subjecting patients to unreasonable risks of injury.

61.    At all times relevant to this action, Exactechs'' inadequate manufacturing processes also led to material flaws in the quality systems at its manufacturing, packaging, storage and distribution facilities.

62.    During the course of manufacturing and distributing the Truliant and Optetrak Devices, Exactech failed in several ways, including, without limitation, by:

   a.   failing to conduct adequate mechanical testing, including oxygen-resistance or other wear testing for the components, subassemblies, and/or finished Optetrak Device;

   b.   failing to test an adequate number of sample devices on an ongoing basis;

   c.   failing to take adequate steps to specifically identify failure modes with clarity and to suggest methods to monitor, avoid, and/or prevent further failures;

   d.   failing to identify and/or note the significance of any testing that resulted in failure of the Optetrak Device;

   e.   failing to take corrective actions to eliminate or minimize further failures of the Optetrak Device;

   f.   failing to adequately explain packaging specifications for the components, subassemblies, and/or finished Optetrak Device;

   g.   failing to perform adequate quality control before the components, subassemblies, and/or finished Optetrak Device were distributed;

   h.   failing to pay attention to reports from their sales representatives who reported their observations while attending revision surgeries where evidence of polyethylene debris and osteolysis was apparent and noted by the surgeons and the sales representatives themselves; and

   i.   failing to timely implement corrective action and investigations to understand the

16

root cause of these failures while continuing to sell the components knowing they would be implanted into the bodies of thousands of people.

63.     On or before the date of Plaintiff's initial and first revision knee replacement surgery, Defendants knew or should have known the Truliant and/or Optetrak Devices were failing and causing serious complications after implantation in patients. Such complications included, but were not limited to, catastrophic polyethylene wear including the deposition of plastic particulate wear debris throughout the knee, a high rate of component loosening, and overall early system failure resulting in tissue destruction, osteolysis, and other injuries causing severe pain, swelling, instability and dysfunction in the knee and leg necessitating revision surgery.

64.     Defendants as manufacturers of orthopedic devices and orthopedic medical providers know that each surgery, especially a revision TKR, is always more complicated than an a primary TKR and is fraught with serious risks of infection, anesthesia errors, additional pain and suffering, longer recovery periods, increased lack of mobility, dislocations and other serious complications that should be avoided.

65.     Defendants, however, ignored and/or concealed reports of early failures of the Optetrak and/or Truliant Devices because, among other reasons, it would result in their collective financial detriment.

66.     Before the date of Plaintiff's primary TKR surgery, Defendants knew or should have known that the Truliant Device was defective and unreasonably dangerous to patients, that the product had an unacceptable failure and complication rate, and that the product had a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

67.     Before the date of Plaintiff's first revision TKR surgery, Defendants knew or should

have known that the Optetrak Device was defective and unreasonably dangerous to patients, that the product had an unacceptable failure and complication rate, and that the product had a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

68.    The FDA has identified the recall of the Exactech devices as a Class II recall. The FDA's classification of the Exactech device's recall as Class II establishes that the device(s) as manufactured and/or designed was adulterated. 21 CFR § 7.3(m)(1).

69.    FDA's classification of the Exactech device(s) recall as Class II establishes that the devices as manufactured and/or designed was misbranded. 21 CFR § 7.3(m)(1).

70.    Upon information and belief, Exactech received numerous reports of adverse events relating to injuries caused by the defective Truliant and/or Optetrak Devices but failed to report these events in violation of FDA's requirements in reporting adverse events. 21 U.S.C. § 352(t).

71.    Defendants Gradisar and Crystal, upon information and belief, also knew and/or should have known of the adverse events relating to injuries caused by the defective Truliant and/or Optetrak Devices but failed to disclose those reports and/or events to their patients prior to implanting the Defective Devices into their patients.

72.    Thus, Defendants were well aware before Plaintiff was implanted with the defective Exactech device(s) that they were failing at an unacceptable rate. Rather than properly recalling the device and/or informing patients and physicians (other than physicians on the Exactech Teams such as Dr. Gradisar) of this risk and the availability of alternative products, Exactech instead attempted to covertly modify the defective, adulterated, and/or misbranded devices without raising suspicion or hurting its sales and goodwill.

73.    In approximately February 2022 Grandis started experiencing increased pain and

18

swelling in her left knee, regardless of activity. Moreover, despite application of ice and rest, the swelling continued unabated. Grandis' pain, inflammation and swelling in her left knee continually worsened in March and April 2022, with pain being constant and worsening throughout the day. During this time, Grandis also started experiencing pain upon standing, decreased weight bearing ability, and a clicking sound in her knee. In May 2022 Grandis received two (2) separate letters from Crystal (one related to each of her TKR surgeries), stating that the Exactech Polyethylene insert relative to both the Truliant and Optetrak Devices had been recalled.

74.    At no time prior to either of her TKR surgeries, either her Primary TKR or her Revision TKR, did Defendant Gradisar disclose to and/or otherwise inform Grandis that he received significant amounts of money from Exactech, was an Exactech consultant, that Defendant Gradisar's father, Dr. Ivan Gradisar, was an Exactech consultant and primary designer of the Optetrak TKR, that Exactech hired Dr. Ivan Gradisar to investigate and audit the reported failures of the Optetrak TKR dating back to 2005, that Defendant Gradisar himself assisted his father, Ivan, in auditing the failures of the Optetrak TKR, or that he knew of the significant amount of failures/revisions associated with the Optetrak TKR. Moreover, despite his knowledge regarding the Optetrak failures and high percentage of revisions required due to the Optetrak Device failing, Defendant Gradisar never recommended or provided Grandis with any other options or alternative devices for her TKR surgeries, other than the known defective Exactech Truliant and Optetrak Devices. In fact, and amazingly and unbeknownst to Grandis, as part of Grandis' revision TKR surgery Gradisar implanted a combination of Truliant and Optetrak components, including the defective and recalled polyethylene inserts.

75.    On June 31, 2022, Grandis phoned Defendant Gradisar's office to inquire about the recall(s). Dr. Gradisar's office returned her call on July 1, 2022 and informed Grandis that "*Dr. Gradisar could not see [her] until sometime in October [2022] as he was inundated with phone*

19

calls from patients about the Exactech recall," further stating "*As you can imagine, he has used a significant amount of these devices and is very busy*."

76.    Grandis was required to undergo her third TKR Revision surgery that took place on December 5, 2022. As a result, Grandis, in addition to the pain and suffering related to her failed TKR's is now experiencing additional and associated pain and suffering to her right hip and right knee, is suffering from insomnia, anxiety and other emotional distress, and either can no longer engage in and/or is severely limited in participating in her normal daily living activities.

77.    On December 5, 2022, Grandis underwent her 2nd TKR revision surgery and her third TKR in 2 years. During this surgery, due to the complexity of removing the cemented device in her femur, she experienced, among other things, significant blood loss requiring 2 blood transfusions and a fractured femur. This also required an extended stay in the hospital as well as the need for non-weight bearing with crutches for 6 weeks.

78.    Grandis in addition to her individual claims also brings this action as a Class Action as to Defendants Exactech, Gradisar and Crystal for continuing to recommend, supply, sell, prescribe and implant the Truliant and Optetrak Devices that Exactech, Gradisar and/or Crystal knew and/or should have known were defective and misbranded and/or adulterated under FDA Regulations and, therefore, illegal to recommend, prescribe, sell or implant into patients like Grandis.

79.    Exactech knew its Truliant and Optetrak Devices were defective and misbranded and/or adulterated and caused widespread device failures, yet Exactech continued to sell the device and refused to submit Adverse Event Reports to the FDA, as required by the Food, Drug and Cosmetics Act. Similarly, Defendants Gradisar and Crystal had knowledge of the Truliant and Optetrak Device unacceptable failure rate(s) due to both their business and financial relationship with Exactech, as well as both Drs. Gradisars'(Ian and Ivan) direct participation in the testing and

20

"auditing" of the Optetrak Device failures, yet continued to recommended, prescribe and implant the Truliant and Optetrak Devices without disclosing their knowledge (and participation in) of the Devices' failure rates to their patients.

80.      Gradisar and Crystal while being paid consultants at Exactech and personally partaking in audits and testing related to the defective Optetrak Device knew and/or should have known that the Optetrak Device (and Truliant Device) they were recommending, prescribing and implanting into their patients was defective and misbranded and/or adulterated and caused widespread device failures yet Gradisar and Crystal continued to negligently and/or intentionally recommend, prescribe, sell and profit from implanting the defective Truliant and Optetrak Devices with express knowledge of the high percentage of revisions required as a result of the defective Devices since at least 2005, and without providing full disclosure to and/or obtaining the required informed consent from patients.

81.      When a medical device manufacturer violates the FDA's requirements for reporting adverse events, then the device becomes misbranded and/or adulterated and illegal to sell in the United States.  Because the defective Truliant and Optetrak Devices were misbranded and/or adulterated under applicable FDA Regulations it was neither reasonable nor necessary – or legal - - for prescription, sale, use and/or implantation into Plaintiff and the Class Members.

82.      Accordingly, because Exactech received Adverse Event Reports of device failures, but did not submit the required Adverse Event Reports,  Exactech violated its mandatory reporting obligations in violation of healthcare laws, rendering the Truliant and Optetrak Devices misbranded and/or adulterated making any subsequent sale, prescription, recommendations and or implantation improper and illegal.

83.      Similarly, because Gradisar and Crystal by way of their special consulting, business and economic relationship with Exactech, specifically related to the Optetrak Device, knew and/or

should have known that Exactech violated its mandatory reporting obligations in violation of healthcare laws, rendering the Optetrak Device misbranded and/or adulterated and any subsequent sale, prescription, recommendations and or implantation of the Optetrak Device by Gradisar and Crystal was also both improper, negligent and illegal.

84.    If provided an adequate warning or instruction of the Optetrak Device, Plaintiff would not have chosen that device, but would rather have pursued a safer alternative to treat her knee replacement requirement.

85.    As a direct and proximate result of the failed and defective Exactech devices, Plaintiff was required to undergo three (3) successive TKR Revision surgeries to repair/replace her failed devices and prevent further injuries.

86.    As a direct and proximate result of the failed and defective Exactech Devices, Plaintiff has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment, and economic damages.

87.    As a direct and proximate result of the failed and defective Exactech devices, Plaintiff has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm, and mental and emotional distress in the future.

88.    As a direct and proximate result of the failed and defective Exactech Devices, Plaintiff has also incurred medical expenses and other economic harm and will continue to incur such expenses and other economic harm in the future.

89.    Furthermore, because Exactech, Gradisar and Crystal improperly and illegally sold, supplied, recommended, prescribed and implanted defective, misbranded and/or adulterated Truliant and/or Optetrak Devices into Plaintiff and the putative Class Members, Plaintiff and the putative Class Members are entitled to return of all money expended for the implantation of the Truliant and/or Optetrak Devices, the disgorgement by Gradisar, Crystal and Exactech of any ill-

Sandra Kurt, Summit County Clerk of Courts

gotten gains, profits and unjust enrichment received and enjoyed by them, and be compensated for any Revision TKR required as a result of same.

## **PARALLEL FEDERAL REQUIREMENTS**

90.　　Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. § 351.

91.　　Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352.

92.　　Exactech is "registered with the FDA as a device establishment. As a result, we are subject to periodic inspection by the FDA for compliance with the FDA's Quality System Regulation requirements and other regulations. The Medical Device Reporting regulations require that we provide information to the FDA whenever there is evidence to reasonably suggest that a device may have caused or contributed to a death or serious injury or, if a malfunction were to occur, could cause or contribute to a death or serious injury."[15]

93.　　Exactech is also  required to Comply with Anticorruption, Anti-Fraud and Abuse Rules, including the physician self-referral prohibition (Ethics in Patient Referrals Act of 1989, as amended, commonly referred to as the Stark Law, Section 1877 of the Social Security Act), which prohibits referrals by physicians of Medicare or Medicaid patients to providers of a broad range of designated healthcare services in which the physicians (or their immediate family

---

[15] Exactech, Inc. Form 10-k Annual Report filed 2017-03-08 at p. 17: http://pdf.secdatabase.com/2668/0000913165-17-000006.pdf.

members) have ownership interests or with which they have certain other financial arrangements.[16]

94.    "In marketing our products, we use a combination of traditional targeted media advertising together with our primary marketing focus, direct customer contact and service to orthopaedic surgeons. Because surgeons are the primary decision makers when it comes to the choice of products and services that best meet the needs of their patients, we focus our marketing strategy on meeting the needs of the orthopaedic surgeon community. In addition to surgeon's preference, hospitals and buying groups, as the economic customers, actively participate with physicians in the choice of implants and services.[17]

95.    On or about August 31, 2021, Exactech issued a letter notifying physicians, patients and consumers that it was recalling the Optetrak Device, including the device implanted into Plaintiff.

96.    On or about April 7, 2022 Exactech issued an "Urgent Medical Device Correction," wherein it advised that:

- "After extensive testing, we have confirmed that approximately 80% of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased

---

[16] Exactech, Inc. Form 10-k Annual Report filed 2017-03-08 at p. 19: http://pdf.secdatabase.com/2668/0000913165-17-000006.pdf.
[17] Id. at p. 50.

24

oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery."

- "Exactech is now expanding the recall to include all knee and ankle arthroplasty polyethylene inserts packaged in non-conforming bags regardless of label or shelf life. During the period between August 2021 and January 2022, non-conforming knee and ankle devices have been shipped and implanted by surgeons."

- "More specifically, all three of these generations of Exactech knee systems have had polyethylene inserts packaged in non-conforming bags at various points during their respective market tenures. The original Optetrak Knee system, introduced in 1994, has shown statistically significant higher overall revision rates as compared to other TKA's in the Australian, United Kingdom and New Zealand registries."

- "The Australian Registry reported a total of 374 TKR revision procedures among 3,684 primary Optetrak TKRs with up to 14- to 20-years follow-up for each prosthesis combination. Every Exactech Optetrak TKR polyethylene component combination demonstrated statistically significant increased revision rates compared to other TKR systems (N=668,852) with at least one and a half years of follow-up with hazard ratios ranging from 1.84 to 5.85

Sandra Kurt, Summit County Clerk of Courts

(p<0.001. The United Kingdom Registry reported that the Exactech Optetrak TKR System utilizing the cruciate retaining femoral component (N=1,638) had statistically significant increased cumulative revision rates compared to all TKRs (N=1,145,052) at the 3, 5, 10, 13 and 15-year timepoints.2 The New Zealand Registry reported a total of 63 TKR revision procedures among 661 primary Optetrak TKRs. The Optetrak TKR revision rate was 1.015/100 component years compared to all other primary TKRs (N=118,430) which had a revision rate of 0.48/100 component years and represented a statistically significant value greater than a two-fold increased revision rate."

- "Additionally, the reasons for revision potentially associated with polyethylene wear (e.g., loosening, lysis, pain) were increased three- to seven-fold in the most used Exactech Optetrak TKR combination (Optetrak-PS/Optetrak) which had a total of 263 TKR revision procedures among 2,410 primary TKRs when compared to other TKRs in the Australian Registry. The reasons for these increased revision diagnoses related to accelerated polyethylene wear may be related to the non-conforming packaging."

- "Please be advised that beginning in August 2021, Exactech recalled product with a labeled 8-year shelf-life that would have a shelf life of 5 years or greater as of August 31, 2022. Exactech is expanding the recall to include the remaining 55,269 non-conforming Exactech Knee and Ankle Ultra-High Molecular Weight Polyethylene (UHMWPE) inserts in the field, regardless of shelf life. There are approximately a total of 143,484 inserts implanted in the US since 2004 that were produced with non-conforming packaging."

Sandra Kurt, Summit County Clerk of Courts

97. The FDA has identified the recall of the Optetrak Device as a Class II recall.

98. FDA's classification of the Exactech device's recall as Class II establishes that the device as manufactured and/or designed was adulterated. 21 CFR § 7.3(m)(2).

99. FDA's classification of the Exactech device's recall as Class II establishes that the device as manufactured and/or designed was misbranded. 21 CFR § 7.3(m)(2).

100. Defendants were well aware before Plaintiff was implanted with the defective Exactech Device(s) that the Devices' material and components were failing at an unacceptable rate. Rather than properly recalling the Devices and/or informing patients of this risk and the availability of alternative products, Defendants instead attempted to covertly modify the defective, adulterated, and/or misbranded devices without raising suspicion or hurting its sales and goodwill, and continued to sell, market, supply, recommend, prescribe and implant the Device while concealing all adverse information related to the Device to their consumers and patients.

101. Pursuant to 21 C.F.R. Part 803.50 Manufacturers must report adverse events associated with a medical device to FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation of each adverse event and must evaluate the cause of the adverse event.

102. Pursuant to 21 C.F.R. Part 803.52, manufacturers of medical devices must also

Sandra Kurt, Summit County Clerk of Courts

describe in every individual adverse event report whether remedial action was taken in regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device.

103.　Pursuant to 21 C.F.R. Part 803.53, manufacturers must report to the FDA in five business days after becoming aware that a medical device reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. Medical device reportable events require the manufacturer to conduct a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to public health.

104.　Pursuant to 21 CFR § 806 and 21 U.S.C. § 360i, medical device manufacturers must report promptly to the FDA any device corrections and removals and maintain records of device corrections and removals.

105.　21 CFR § 806(d) defines a correction as the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location.

106.　21 CFR § 806(j) defines a removal as the physical removal of a device from its point of use to some other location for repair, modification, adjustment, relabeling, destruction, or inspection.

107.　FDA regulations require submission of a written report within ten working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of federal law caused by the device that may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device

28

report numbers. Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the correction or removal and provide a copy of all communications regarding the correction or removal. See 21 C.F.R. Part 806.10. A device that fails to report such information is deemed to be misbranded. See. 21 U.S.C. § 352(t) & 21 U.S.C. § 360i(g).

108.  Pursuant to 21 CFR § 7.49(a) and 21 CFR § 820.100, a manufacturer that initiates a correction or removal is responsible for ensuring the effectiveness of the action and promptly notifying each of its affected direct accounts about the action.

109.  Upon information and belief, Exactech failed to comply with federal regulations regarding its initiation and communication of corrective and removal actions for its Optetrak device.

110.  Had Exactech followed the required removal/corrective action notification and communication regulations, Plaintiff would not have been implanted with the defective device that resulted in her injuries.

111.  Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice (CGMP), as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. See 21 U.S.C. § 360j(f).

112.  The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 et seq. As explained in the Federal Register, manufacturers must adopt

Sandra Kurt, Summit County Clerk of Courts

current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

113.   Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

114.   Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. See 21 CFR § 820.3(v).

115.   Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

116.   Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

117.   Pursuant to 21 CFR § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

118.   Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

119.   Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the

Sandra Kurt, Summit County Clerk of Courts

design input requirements.

120.   Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

121.   Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

122.   Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

123.   Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

a. Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;

b. Monitoring and control of process parameters and component and device characteristics during production;

c. Compliance with specified reference standards or codes;

d. The approval of processes and process equipment; and

e. Criteria for workmanship which shall be expressed in documented standards or by

31

means of identified and approved representative samples

124.   Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

125.   Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

126.   Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

127.   Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

128.   Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

129.   Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate compute software for its intended use according to an established protocol.

130.   Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and

Sandra Kurt, Summit County Clerk of Courts

test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

131.  Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. See 21 CFR § 820.3(z)(1).

132.  Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualified individuals.

133.  Pursuant to 21 CFR § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

134.  Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

 a. Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems;

b. Investigating the cause of nonconformities relating to product, processes, and the quality system

33

c. Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

d.      Verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

e. Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

f. Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

g. Submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

135.   Upon information and belief, Exactechs' Truliant and Optetrak Devices are, and at all relevant times herein were, adulterated and/or misbranded pursuant to 21 U.S.C. § 351/52 because, among other things, it failed to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. § 351, and because Exactech failed to establish and maintain CGMP for its Truliant and Optetrak Devices in accordance with 21 CFR § 820 et seq. as set forth above.

136.   Upon information and belief, Exactech failed to establish and maintain CGMP with respect to quality audits, quality testing and process validation for its Truliant and/or Optetrak Devices.

137.  Upon information and belief, Exactech did not conduct any adequate clinical studies to establish the safety of the Truliant and/or Optetrak Device under actual or simulated

34

use conditions.

138.  Upon information and belief, as previously described Exactech also failed to adequately report, monitor, and investigate reports of the Truliant and/or Optetrak Device failures and unacceptable rates of revision that were ongoing with the Devices.

139.  As a result of Defendant's failure to establish and maintain CGMP, Exactechs' Truliant and Optetrak Devices were defective and failed, resulting in serious injuries a nd damages to Plaintiff.

140.  If Exactech had complied with the federal requirements regarding CGMP, Exactechs' Truliant and Optetrak Devices would have been designed/manufactured properly such that they would not have failed and/or been implanted into Plaintiff and would not have resulted in injuries to Plaintiff.

141.  Upon information and belief, Exactechs' Truliant and Optetrak Devices were adulterated because, among other things, they failed to meet represented specifications and/or failed to perform as represented. See 21 U.S.C. § 351. For example, by at least early 2008 Exactech was on notice of and discussed internally the failures of the Optetrak Device yet rejected the idea of recalling the Device out of fear that doing so would cause Exactech severe financial damage. Thus, not until August 2021, approximately 13 years later, did Exactech, being forced to *publicly* acknowledge what it had internally known since 2008 that the Optetrak Device was failing at an unacceptable rate and posing dangerous health concerns to consumers and patients when used in the manner prescribed, recommended, suggested, and/or failed to meet performance standards, recalled all such devices from the market under an FDA Class II recall.

142.  Upon information and belief, Exactech's Truliant and Optetrak Devices were misbranded because, among other things, they were dangerous to health when used in the manner

35

prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352. For example, by at least early 2008 Exactech was on notice of and discussed internally the failures of the Optetrak Device yet rejected the idea of recalling the Device out of fear that doing so would cause Exactech severe financial damage. Thus, not until August 2021, approximately 13 years later, did Exactech, being forced to *publicly* acknowledge what it had internally known since 2008 that the Optetrak Device was failing at an unacceptable rate and posing dangerous health concerns to consumers and patients when used in the manner prescribed, recommended, suggested, and/or failed to meet performance standards, recalled all such devices from the market under an FDA Class II recall.

143.    Exactech is prohibited by the FDA and/or federal law from distributing, marketing, and/or selling adulterated and/or misbranded devices.

144.    21 U.S.C. § 360k(a) does not preempt Plaintiff's claims.

145.    Plaintiff's claims assert conduct that both violates the Food Drug and Cosmetic Act and also gives rise to recovery under Ohio law in the absence of the Food Drug and Cosmetic Act.

## LAURA GRANDIS' IMPLANTS AND REVISION SURGERIES

146.    On November 30, 2020, Grandis underwent her Primary TKR of the left knee and was implanted with an Exactech Truliant Total Knee System.

147.    On July 1, 2020 Grandis reported during her 30-week post-surgery follow-up that she was experiencing new and worsening of symptoms that persisted for the past 3 months (started in March 2021 timeframe and approximately 4 months after surgery). These included:

  a.    Severe pain in knee (medial and diffuse locations);

  b.    Knee unstable and "giving out":

Sandra Kurt, Summit County Clerk of Courts

c. Pain worse with twisting movements and with every step:

d. Pain described as "catching and stiffness" and aggravated with walking, walking stairs, standing and changing position;

e. Symptoms occur with any activity and intermittent;

f. Pain was at 6 of 10 when in the office and at best and at worst an 8 of 10;

g. Tried treating with anti-inflammatory medications but didn't work well to alleviate pain;

h. Impacted ability to continue physical therapy, work, walk, conduct any activity and to sleep;

i. was unable to walk without a cane or a walker;

j. continued to use Percocet to try to manage the pain

148. Gradisar then conducted an X-Ray and informed Grandis that her TKR "failed," also stating that this was [allegedly] "very rare and only happened 5% of the time." He further, falsely, told Grandis that "for my first couple months following surgery, my femur had been growing into the device but then must have stopped shortly after. Unfortunately, the device was showing that it was no longer adhered to the femur and would need to be replaced through another 'revision' surgery." However, her medical report provides that "Mechanical loosening of internal left knee prosthetic and failed left total knee, loose press-fit femoral component."

149. On July 26, 2021 Gradisar performed the Revision TKR on Grandis and this time implanted the Defective Optetrak Device.

150. In March/April 2022, Grandis began experiencing increased and worsening pain from her prior February 2022 visit. At this time Grandis was experiencing, among other things:

a. Inability to exercise;

37

    b.   Reduced ability to walk;

    c.   Pain while traveling for work;

    d.   Pain worsening throughout the day require ice therapy;

    e.   Increased swelling;

    f.   Inability to bear weight;

    g.   "clicking: in the knee; and

    h.   Increased sharp pain and achiness in her right (non-surgical) knee

151.    In May/June of 2022 Grandis received two (2) separate letters from Crystal advising of the subject recalls.

152.    On December 5, 2022 Plaintiff underwent her third TKR and second revision surgery. This was Grandis' 2nd total knee revision and her 3rd knee replacement surgery in 2 years. During this surgery, due to the complexity of removing the cemented device in her femur, she experienced significant blood loss requiring 2 blood transfusions and a fractured femur. This also required an extended stay in the hospital as well as the need for non-weight bearing with crutches for 6 weeks.

153.    Upon information and belief, the loose components and osteolysis in Plaintiff's left knee was due to premature polyethylene wear of the tibial insert.

154.    Following the revision TKR surgeries, Plaintiff continues to be limited in her activities of daily living. Plaintiff has difficulty with daily activities such as getting dressed, climbing stairs, walking, weight bearing and bathing (among other things).

155.    Despite undergoing the revision surgeries, Plaintiff experiences daily pain and discomfort in her bilateral knees which limits her activities of daily living and impacts her quality of life.

Sandra Kurt, Summit County Clerk of Courts

156.    Plaintiff did not possess technical, scientific or medical knowledge and information sufficient to ascertain the cause of her injuries until Defendants initiated a recall process of the Optetrak Device in February of 2022.

157.    Further, Defendants, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true and significant risks associated with the Truliant and Optetrak Devices.

158.    As a direct, proximate and legal consequence of the defective nature of the Truliant and Optetrak Devices as described herein, Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

159.    As a further direct, proximate and legal consequence of the defective nature of the Optetrak Device, Plaintiffs have sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; loss of consortium and pain and suffering.

## CLASS ALLEGATIONS AS TO DEFENDANTS
## GRADISAR, CRYSTAL AND EXACTECH

160.    Plaintiff's Class Action is for (1) medical malpractice (Subclass 1) and illegal sale of a misbranded and/or adulterated medical device (Subclass 2), by reason of the negligence, fraud misrepresentation, unjust enrichment and civil liability for criminal acts of Defendants Gradisar and Crystal, during the period January 1, 2008 to the present ("Class Period"); and the illegal sale, prescription, recommendation and supply of the misbranded/adulterated Truliant and Optetrak Devices for the period January 1, 2008 to the present.

161.    Grandis brings her class action against Gradisar and Crystal on behalf of herself

39

individually and all others similarly situated pursuant to Ohio Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of the following Class initially defined as follows:

<u>**Subclass 1 – As to Gradisar and Crystal**</u>

*All patients of Dr. Ian Gradisar and/or Crystal Clinic who underwent total knee replacement[18] implanting the "Truliant" or "Optetrak" total knee replacement system for the period 2008 to the present.*

<u>**Subclass 2 – As to Gradisar, Crystal and Exactech**</u>

*All patients of Dr. Ian Gradisar and/or Crystal Clinic who were sold, prescribed, recommended, supplied and implanted with the misbranded and/or adulterated Truliant and Optetrak Device for the period January 1, 2008 to the present.*

162.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

163.    Plaintiffs reserve the right to amend the definitions of the Subclasses defined above and/or add additional Subclasses if further information and discovery indicate that the definitions of the Subclasses should be narrowed, expanded, or otherwise modified.

164.    ***Numerosity:*** The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 10,000 individuals underwent a TKA implanting the misbranded and/or adulterated Truliant and/or Optetrak Devices during the class period. The Subclasses are identifiable within Defendants' records, and upon information and belief Defendants' have already and/or have the ability to identify all persons in the Subclasses.

---

[18] Typically referred to as total knee arthroplasty or "TKA."

40

165.  ___*Ascertainability:*___ The precise number of Class Members and their identities and addresses are currently unknown to Plaintiff at this time, but upon information and belief exceed well in excess of 10,000 persons; nonetheless such number, and the identity and address of each Class Member(s), can be readily ascertained from Exactech's, Gradisar's and Crystal's business records and public court dockets and filings. Class Members may be notified of the pendency of this action by mail and/or electronic mail, social media platforms such as Facebook, Instagram, LinkedIn, TikTok, and/or Twitter and/or supplemented (if deemed necessary or appropriate by this Honorable Court) by published notice.

166.  ___*Commonality:*___ Common questions of law and fact exist as to all members of the Subclasses and predominate over any questions affecting solely individual members of the Subclasses. Among the questions of law and fact common to the Subclasses that predominate over questions which may affect individual Subclass members, including the following:

a.      Whether Defendants sold, prescribed, recommended, supplied and implanted patient consumers with the misbranded and/or adulterated Truliant and/or Optetrak Devices;

b.      Whether Defendants Gradisar and Crystal had respective duties to disclose to patient consumers their economic and business relationship with Exactech;

c.      Whether and when Defendants knew of the true failure rate of the Truliant and Optetrak Devices;

d.      Whether Defendants violated the law by selling, prescribing, recommending, supplying and/or implanting patient consumers with the misbranded and adulterated Truliant and/or Optetrak Devices;

e.      Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of Defendants' wrongful conduct;

41

f.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendants' wrongful conduct;

g.      Whether Defendants should have and/or failed to review and/or enhance their quality procedures to ensure that they clearly and conspicuously required prompt reporting and disclosure of quality issues to regulators and patients/consumers;

h.      Whether Defendants introduced misbranded devices into interstate commerce with the intent to defraud and/or mislead patent consumer;

i.      Whether Defendants were unjustly enriched by their sale, supply, prescription and implanting of the Truliant and/or Optetrak Devices and should disgorge all ill-gotten gains garnered therefrom.

167.    ***Typicality:*** Plaintiff's claims are typical of those of the other members of the Subclasses because Plaintiff, like every other Subclass Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Subclasses.

168.    ***Policies Generally Applicable to the Class:*** This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Subclasses, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Subclass Members and making final injunctive relief appropriate with respect to the Subclasses as a whole. Defendants' policies challenged herein apply to and affect Subclass Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Subclasses as a whole, not on facts or law applicable only to Plaintiff.

169. ***Adequacy:*** Plaintiff will fairly and adequately represent and protect the interests of the Subclass Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Subclass Members. Plaintiff seeks no relief that is antagonistic or adverse to the Subclass Members and the infringement of the rights and the damages she has suffered are typical of other Subclass Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

170. ***Superiority and Manageability:*** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Subclass Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that tens of thousands of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Subclass Members, who could not individually afford to litigate a complex claim against large corporations and organizations, like Defendants herein. Further, even for those Subclass Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

171. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Subclasses and will establish the right of each Class Member to recover on the

43

cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

172.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

173.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

174.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly disclose material conflicts of interest and economic incentives with medical device suppliers in order to fully inform patient consumers and secure the required informed consent of Class Members, Defendants may continue to refuse to provide proper disclosures to Class Members regarding the economic incentives/conflict of interests with medical device suppliers/manufacturers, and Defendants may continue to act unlawfully as set forth in this Complaint.

175.    Further, Defendants have acted on grounds that apply generally to the Subclasses as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis. This includes, but is not limited to:

> a.    Declaratory and injunctive relief requiring Defendants disclose to patients and consumers, in writing and prior to prescribing and/or recommending and/or implanting any medical device(s), all financial and/or consulting and/or business relationships and/or other conflicts of interests between themselves and medical device suppliers relative to their patients' medical needs;

44

b. Declaratory and injunctive relief requiring Defendants disclose to patients and consumers, in writing and prior to prescribing and/or recommending and/or implanting any medical device(s), all adverse reports that Defendants have received and/or have knowledge of related to the particular medical devices they suggest, recommend and /or prescribe for implantation to patients;

176. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely, accurately and adequately disclose the economic incentives/conflict of interests with medical device suppliers/manufacturers;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in timely, accurately and adequately disclose the adverse reports that Defendants had received and/or had knowledge of related to the particular medical devices they suggest, recommend and /or prescribe for implantation to patients;

c. Whether Defendants failed to timely, accurately and adequately disclose the adverse reports that Defendants had received and/or had knowledge of related to the particular medical devices they suggest, recommend and /or prescribe for implantation to patients;

d. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in timely, accurately and adequately disclose the economic incentives/conflict of interests with medical device suppliers/manufacturers.

45

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### *MEDICAL MALPRACTICE*
### *(Gradisar)*

177.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

178.    Defendant Gradisar was at all times relevant hereto Plaintiff's Primary Orthopedic Surgeon and care practitioner.

179.    Defendant Gradisar by his acts and/or omissions, failed to provide the Plaintiff with competent, safe and acceptable medical care and treatment and negligently failed to follow the usual skills and procedures regularly used by members of his profession in regard to the care and treatment that was rendered to the Plaintiff.

180.    Plaintiff timely issued and served Defendant Gradisar, via certified mail, with 180-day letters extending the applicable statute of limitations in accordance with O.R.C. §2305.11.

181.    Defendant Gradisar timely received, via certified mail, the 180-day letters on July 11, 2022.

182.    Plaintiff relied on Defendant Gradisar to provide standard, safe, and acceptable medical care and treatment.

183.    Defendant Gradisar breached the standard of care for proper medical care and treatment he owed to Plaintiff. In particular, at all times relevant hereto, Plaintiff was under the primary care and treatment of Defendant Gradisar. While she was under the care and treatment, Defendant Gradisar was negligent in failing to properly evaluate, diagnose, plan for, care, and/or treat Plaintiff including, but not limited to:

46

A. Gradisar engaged in a direct and indirect conflict of interest detrimental to Plaintiff by making personal gain from receiving payments from Exactech to use and promote the Optetrak total knee replacement system, rendering Plaintiff partial towards Exactech for personal reasons and/or otherwise inhibiting Gradisar from being impartial to serve the best health interests of Plaintiff;

B. Gradisar recommended, promoted and used the Optetrak total knee replacement system to his patients such as Plaintiff based on his financial relationship with Exactech, not the quality of the device;

C. Gradisar fell below the accepted standards of care, skill, and diligence for healthcare providers in Ohio and Nationwide in the care and treatment of Plaintiff. Gradisar's failure to meet the accepted standards of care, skill, and diligence includes all breaches of his duties and standard of care as alleged herein related to Plaintiff's TKR surgeries;

D. Failing to properly, fully and completely disclose to Plaintiff all conflicts of interest that Gradisar had related to Exactech and the Optetrak Device;

E. Failing to warn Plaintiff of the Optetrak Device failure rate;

F. Failing to provide Plaintiff with alternative total knee replacement system devices, other than the Optetrak Device;

G. Gradisar by his acts and/or omissions, failed to provide the Plaintiff with competent, safe and acceptable medical care and treatment and negligently failed to follow the usual skills and procedures regularly used by members of his profession in regard to the care and treatment that was rendered to the Plaintiff.

47

H.  Gradisar failed to disclose to Plaintiff all material information related to his and his father's business, economic and consulting relationship with Exactech;

I.  Gradisar failed to disclose to Plaintiff all material information he possessed related to the Truliant and Optetrak Devices;

J.  Gradisar failed to provide Plaintiff with alternative TKR replacement systems and/or Devices, other than the Exactech Devices;

K. Gradisar failed to provide and/or receive Plaintiff's required informed consent;

L. Gradisar performed the primary and revision TKR surgeries on Plaintiff in a negligent and below standard manner.

184.    As a direct and proximate result of these and other failures, acts and omissions by the Gradisar, Plaintiff has and will continue to endure great fear, distress, mental anguish, serious physical pains, permanent injuries, loss of use of and ongoing medical care and treatment.

185.    As a direct and proximate result of the negligence described above, Plaintiff sustained permanent injury and loss of enjoyment of life, including but not limited to, conscious pain and suffering disability, loss of use of her limb, permanent physical functional injury and significant past, ongoing and future medical expenses, emotional distress,

186.    WHEREFORE, Plaintiff demands judgment against the Defendant Gradisar in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

48

## SECOND CAUSE OF ACTION

### *STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT*
#### *(Exactech)*

187.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

188.    Defendant is the manufacturer, designer, distributor, seller, and/or supplier of total knee replacement devices, including the Truliant and Optetrak Devices.

189.    Prior to Plaintiff's initial and revision knee surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Optetrak Device for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

190.    The Defendants had a duty to manufacture the Optetrak Device in a manner that prevents unreasonable risk of harm or injury to users and patients, including Plaintiff.

191.    The Defendants had a duty to distribute, market, and/or sell the Optetrak Device without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury to users and patients, including Plaintiff.

192.    The Truliant and Optetrak Devices manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendant, were defective in their manufacture and construction when they left the hands of Defendant in that they deviated from product specifications and/or applicable federal requirements for these medical devices, posing a serious risk of injury and death.

193.     The Optetrak Devices manufactured by the Defendants were not reasonably safe for their expected, intended, and/or foreseeable uses, functions and purposes.

194.    The Optetrak Devices were not reasonably safe as manufactured, packaged,

49

distributed, marketed and/or sold by the Defendants.

195.    The defects in manufacture of the Optetrak Device were a substantial factor in causing Plaintiffs' injuries.

196.    As alleged herein, Defendants knew or had reason to know that the Truliant and Optetrak Devices caused an increased risk of harm to the Plaintiff and other consumers due to the device's propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

197.    The devices were manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq. and applicable FDA regulations. The facilities or controls used by Defendant in the manufacture, packing, storage, or installation of the devices were not in conformity with applicable regulations and FDA-approved specifications for the devices or the CGMP[19] requirements set forth in FDA's quality system regulations, 21 C.F.R. Part 820.

198.    As a direct and proximate result of Plaintiff's use of Defendant's Truliant and Optetrak Devices, as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant and/or the failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

199.    As a direct, proximate and legal consequence of the defective nature of the Truliant and Optetrak Devices as described herein Plaintiff has suffered and continues to suffer permanent and debilitating injures and damages, including but not limited to, significant pain and discomfort; gait

---

[19] Current Good Manufacturing Practice.

Sandra Kurt, Summit County Clerk of Courts

impairment; poor balance; difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

200.    Defendant is strictly liable for selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improperly manufactured condition in violation of Ohio law and parallel federal requirements.

201.    Defendant's actions and omissions as alleged in this Complaint constitute a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

202.    WHEREFORE, Plaintiff demands judgment against the Defendant Exactech in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

### *THIRD CAUSE OF ACTION*

### *STRICT PRODUCTS LIABILITY – DESIGN DEFECT*
*(Exactech)*

203.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

204.    Defendant is the manufacturer, designer, distributor, seller, and/or supplier of total knee replacement system devices, including the Truliant and Optetrak device(s).

205.    The device(s) manufactured and supplied by Defendant was defective in design or formulation in that, when it left the hands of the Defendant, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary consumer would expect, and/or it failed to comply with federal requirements for these

51

medical devices.

206.    The foreseeable risks associated with the design or formulation of the device(s), include, but are not limited to, the fact that the design or formulation of the device(s) is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or it failed to comply with federal requirements.

207.    Multiple other products with safer alternative designs exist that are approved for total knee replacement(s) with comparable or better efficacy.

208.    FDA's initial approval of the device(s) do not insulate Defendant from liability for injury or harm caused by use of the product(s) due to design defect, because FDA has determined that the device(s) is dangerous to health and safety when used as directed and required a Class II recall.

209.    The allowance of damages under Ohio law for harm caused by a defectively designed medical device that FDA has determined is a hazard to human health and subject to a Class II recall, provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

210.    The allowance of damages under Ohio law for harm caused by a defectively designed medical device that remained on the market due to a manufacturer's failure to comply with federal requirements, provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

211.    As a direct and proximate result of Plaintiff's use of the device(s), as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendant and/or its failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic

Sandra Kurt, Summit County Clerk of Courts

loss in the future.

212.    Defendant is strictly liable for selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of Ohio law and parallel federal requirements.

213.    Defendant's actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

214.    WHEREFORE, Plaintiff demands judgment against the Defendant Exactech in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

### FOURTH CAUSE OF ACTION

### *STRICT PRODUCTS LIABILITY – FAILURE TO WARN*
#### *(Exactech)*

215.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

216.    Defendant is the manufacturer, designer, distributor, seller, and/or supplier of Total Knee Replacement System devices, including the Optetrak and Truliant devices.

217.    The devices manufactured, designed, marketed, distributed and sold by Defendant were defective as outlined herein because at the time they left the control of Defendant and was supplied to Plaintiff, Defendant knew or should have known that its products were unreasonably dangerous, as confirmed by its own internal data, because the devices substantially and significantly increases the risk harm and necessity of revision TKR surgeries. Despite this

*Sandra Kurt, Summit County Clerk of Courts*

knowledge, Defendant failed to adequately warn Plaintiff and/or his physicians (other than its consultants) of the increased risk or provide adequate instructions for the devices safe use.

218.    Multiple other products with safer alternative designs exist that are approved for implantation of total knee replacement systems with comparable or better efficacy.

219.    FDA's initial approval of the devices do not insulate Defendant from liability for injury or harm caused by use of the product due to failure to adequately warn or instruct, because FDA has determined that the devices are defective when used as directed and required a Class II recall.

220.    The allowance of damages under Ohio law for harm caused by a medical device that fails to provide adequate warning or instruction, in that FDA has determined the device(s) is/are defective and subject to a Class II recall, and therefore Ohio law provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

221.    The allowance of damages under Ohio law for harm caused by the device(s) that failed to provide adequate warnings and instructions for use, and that remained on the market due to a manufacturer's failure to comply with federal requirements, provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

222.    As a direct and proximate result of Plaintiff's use of the device(s) as manufactured, designed, marketed, distributed, and sold by Defendant and/or its failure to comply with applicable federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and damages and will continue to suffer such harm, damages and economic loss in the future.

223.    Defendant is strictly liable for selling and distributing medical devices in an unsafe,

defective, unreasonably dangerous, and/or improper condition in violation of violation of Ohio law and parallel federal requirements.

224.    Prior to Plaintiff's TKR surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

225.    Defendants had a duty to provide adequate warnings regarding the Truliant and Optetrak Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

226.    Defendants had a duty to distribute, market, and/or sell the Truliant and Optetrak Devices with adequate warnings that did not present an unreasonable risk of harm or injury to users and patients exposed to their danger, including Plaintiff.

227.    The warnings that accompanied the Truliant and Optetrak Devices and corresponding packaging were defective thereby making the product not reasonably safe for its expected, intended, and/or foreseeable uses, functions and purposes.

228.    The Truliant and Optetrak Devices and corresponding packaging are not reasonably safe as labeled, distributed, marketed, delivered and./or sold by Defendants.

229.    Inadequate labeling accompanying the Truliant and Optetrak Devices and packaging received by Plaintiff's implanting surgeon was a substantial factor in causing Plaintiff's injuries.

230.    At all times relevant to this action, the Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective.

Sandra Kurt, Summit County Clerk of Courts

231.    The Truliant and Optetrak Devices were defective and unreasonably dangerous when they entered the stream of commerce and were received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its sales force with or about the Truliant and Optetrak Devices failed to adequately convey the potential risks and side effects of the Truliant and Optetrak Devices and the dangerous propensities of the devices, which risks were known or were reasonably scientifically knowable to Defendants.

232.    In particular, Defendants failed to adequately disclose the devices' propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, bone loss, osteolysis, and other injuries as well as the need for revision surgery in patients.

233.    Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Truliant and Optetrak Devices; and continuing to market, promote, sell and defend the Truliant and Optetrak Devices until the very recent recall.

234.    Defendants knew or reasonably should have known and been aware that the Truliant and Optetrak Devices and packaging contained inadequate warnings.

235.    The inadequate warnings for the Truliant and Optetrak Devices existed when the devices left the Defendants' control.

236.    The Truliant and Optetrak Devices as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by Defendants reached Plaintiff without substantial change in its condition.

237.    As alleged herein, Defendants knew or had reason to know that the Truliant and

56

Optetrak Devices caused an increased risk of harm to the Plaintiff and other consumers due to the Devices' propensity to undergo substantial early polyethylene wear, component loosening, and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients.

238.    The Truliant and Optetrak Device that was labeled, manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably dangerous to any user or ordinary consumer of the device, including Plaintiff.

239.    The labeling defects of the Truliant and Optetrak Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when used and operated for the purposes intended by Defendants.

240.    The labeling defects of the Truliant and Optetrak Devices and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Plaintiff, when they were used and operated in a manner that was foreseeable to Defendants.

241.    Plaintiff could not, by the exercise of reasonable care, have discovered these defects and perceived its dangers or avoided injury.

242.    The Defendants are strictly liable for providing inadequate warnings accompanying the Truliant and Optetrak Devices and packing of the Devices; the distribution, marketing, and/or sale of the Truliant and Optetrak Devices; and the injuries sustained by Plaintiff.

243.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

57

244.     By reason of the foregoing acts, omissions and conduct committed by Defendants, Plaintiff was caused to sustain serious personal injuries, conscious pain and suffering, and physical disability that will require continued and additional medical treatment.

245.     As a direct, proximate and legal consequence of the defective nature of the Truliant and Optetrak Devices as prescribed herein, Plaintiff has suffered and continues to suffer permanent and debilitating injuries and damages, including but not limited to, significant pain and discomfort, gain impairment; poor balance, difficulty walking; component part loosening; soft tissue damage; bone loss; and other injuries presently undiagnosed, which all require ongoing medical care.

246.     WHEREFORE, Plaintiff demands judgment against the Defendant Exactech in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

### FIFTH CAUSE OF ACTION

### *NEGLIGENCE*
### *(Exactech And Gradisar And Crystal Clinic)*

247.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

248.     Prior to Plaintiff's TKR surgeries, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

249.     Prior to, on, and after the dates of Plaintiff's TKR surgeries, and at all times relevant to this action, Defendants had a duty to exercise reasonable care in the testing, study, research, design,

58

formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution and sale of the Optetrak Device for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States.

250.    Prior to, on, and after the dates of Plaintiff's TKR surgeries, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in the testing, study, research, design, formulation, manufacture, inspection, labeling, packaging, promotion, advertisement, marketing, distribution and sale of the Truliant and Optetrak Devices.

251.    At all times material hereto, the Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers associated with the Truliant and Optetrak Devices.

252.    Defendants had access to registry data and were aware of complaints that the Truliant and Optetrak Devices caused serious complications including but not limited to polyethylene wear and/or other failure causing serious complications including component loosening, tissue damage, osteolysis, bone loss and the need for revision surgery(s) in patients.

253.    Despite the fact Defendants knew or should have known the Truliant and Optetrak Devices posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market and supply and recommended and prescribe the Truliant and Optetrak Device for implantation into consumers.

254.    Defendants failed to exercise due care under the circumstances in one or more ways and individually and/or jointly, and their gross negligence and recklessness includes the following acts and omissions, and without limitation:

a.    Negligently failing to properly package the polyethylene components of the Truliant and Optetrak Devices;

b.    Negligently failing to select appropriate third-parties to package the polyethylene inserts used in the Truliant and Optetrak Devices;

59

c.      Negligently failing to properly supervise and monitor the packaging of the polyethylene inserts used in the Truliant and Optetrak Devices;

d.      Negligently failing to properly and thoroughly select the material that would be used in the packaging of the Truliant and Optetrak Devices;

e.      Negligently failing to properly and thoroughly select the materials that would be used in the Truliant and Optetrak Devices;

f.      Negligently failing to test the Truliant properly and adequately and Optetrak Devices and their attendant parts before releasing the devices to market;

g.      Negligently failing to conduct sufficient post-market testing and surveillance of the Truliant and Optetrak Devices;

h.      Negligently failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the Truliant and Optetrak Device in accordance with good practices;

i.      Negligently designing, manufacturing, marketing, advertising, distributing, recommending, prescribing, selling and implanting the Truliant and Optetrak Devices;

j.      Continuing to negligently manufacture, distribute, supply, recommend, prescribe and/or implant the Truliant and Optetrak Devices after the Defendants knew or should have known of their adverse effects and/or the increased early onset failure rates;

k.      Negligently designing, manufacturing, marketing, advertising, distributing, selling, recommending, prescribing and implanting the Truliant and Optetrak Devices to consumers and patients, including Plaintiff and Class Members, without an adequate warning of the dangerous risks of the Truliant and Optetrak Devices;

l.      Negligently diminishing or concealing the risks associated with the implantation of the Truliant and Optetrak Devices;

m.     Negligently violating applicable state and federal laws and regulations; and in all other ways; and

n.      Negligently recommending, prescribing and implanting the Truliant and Optetrak Devices.

255.    Defendants knew and/or should have known that it was foreseeable that patients consumers such as Plaintiff and the Class Members would suffer injuries as a result of Defendants'

60

failure to exercise ordinary care in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Defective Implants, recommending, prescribing, implanting and otherwise distributing the Truliant and Optetrak Devices.

256.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff and Class Members were caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial economic losses and damages.

257.    WHEREFORE, Plaintiff demands judgment against the Defendant Exactech in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

### *SIXTH CAUSE OF ACTION*

### *NEGLIGENT MISREPRSENTATION*
### *(Exactech And Gradisar And Crystal Clinic)*

258.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

259.    Prior to Plaintiff's TKR surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, recommended, supplied, prescribed, distributed, and/or sold the Truliant and Optetrak Devices for implantation into consumers, such as Plaintiff.

260.    Exactech owed a duty to orthopedic surgeons, other healthcare providers, consumers, and patients and recipients of the Truliant and Optetrak Devices, including Plaintiff and Class

61

Members, to represent the risks of the Truliant accurately and truthfully and Optetrak Devices. Defendants breached their duty by misrepresenting and/or failing to adequately warn and/or fully disclose to Plaintiff and/or the putative Class Members, and the public about the risks of the Truliant and Optetrak Devices, including the devices' propensity to undergo substantial early polyethylene wear, component loosening and/or other failures causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

261.    Similarly Gradisar and Crystal owed a duty as orthopedic surgeons and healthcare providers to consumers, and patients and recipients of the Truliant and Optetrak Devices, including Plaintiff and Class Members, to represent the risks of the Truliant accurately and truthfully and Optetrak Devices. Defendants breached their duty by misrepresenting and/or failing to adequately warn and/or fully disclose to Plaintiff and/or the putative Class Members, and the public about the risks of the Truliant and Optetrak Devices, including the devices' propensity to undergo substantial early polyethylene wear, component loosening and/or other failures causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery in patients, which Defendants knew or in the exercise of diligence should have known.

262.    The Defendants, as the designers, manufacturers, sellers, promoters, suppliers, prescribers, surgeons, caregivers, healthcare providers and/or distributors of the Truliant and Optetrak Devices knew, or reasonably should have known, that patients and consumers of the Truliant and Optetrak Devices would rely on information disseminated and marketed to them regarding the product when weighing the potential benefits and potential risks of implanting the Truliant and Optetrak Devices.

263.    The Defendants, as the designers, manufacturers, sellers, promoters, suppliers,

prescribers, surgeons, caregivers, healthcare providers and/or distributors of the Truliant and Optetrak Devices knew, or reasonably should have known, that the patients implanted with the Truliant and Optetrak Devices would suffer early failure and require revision surgery(s) because the information disseminated by Defendants and relied upon by patients and consumers, including Plaintiff and/or the putative Class, was materially inaccurate, misleading, or otherwise false.

264.    The Defendants failed to exercise reasonable care to ensure that the information they disseminated to patients and consumers, including Plaintiff and/or the putative Class Members concerning the quality and longevity of the Truliant and Optetrak Device was accurate, complete, and not misleading. As a result, Defendants disseminated information to health providers, patients, consumers, such as Plaintiff and the putative Class Members, that was materially inaccurate, misleading, false, and unreasonably dangerous to patients and consumers such as Plaintiff and/or the putative Class Members.

265.    Among Defendants' numerous misrepresentations and misleading omissions are Defendants' assurances that the Truliant and Optetrak Devices were safe, had an excellent performance record, and did not have a greater propensity to undergo substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery(s) in patients.

266.    Despite their knowledge of serious problems with the Truliant and Optetrak Devices, Defendants urged their sales representatives, colleagues, hospital personnel, etc. to continue marketing, selling, prescribing, supplying and implanting the Truliant and Optetrak Devices, and distributed medical literature, white papers, non-peer reviewed studies, and other communications to surgeons, patients, consumers, such as Plaintiff and the putative Class Members, in an effort to mislead them and the general public about the risks associated with the Truliant and Optetrak Devices and

63

instead create the image and impression that the Truliant and Optetrak Devices were safe when, in fact, they were not.

267.    Defendants made such statements even after they became aware of numerous and serious complications with the Truliant and Optetrak Devices. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications and other bad data.

268.    Defendants made these representations with the intent to induce reliance thereon, and to encourage purchase and implantation of the Truliant and Optetrak Devices.

269.    The misrepresentations made by Defendants, in fact were false and known by Defendants to be false at the time the misrepresentations were made.

270.    Defendants failed to exercise ordinary care in making their representations concerning the Truliant and Optetrak Devices and, in the manufacture, sale, testing, quality assurance, quality control, supply, prescription, implantation and distribution in interstate commerce of the Truliant and Optetrak Devices.

271.    By reason of the foregoing acts, omissions and conduct committed by the Defendants, Plaintiff and/or the putative Class Members were caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, additional medical treatment(s), emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

272.    As a direct and proximate result of Defendants' acts and omissions, including Defendants' negligent misrepresentations regarding the Truliant and Optetrak Devices, Plaintiff and the putative Class Members were implanted with the Truliant and Optetrak Devices and were caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, additional medical treatment(s), emotional distress, fear, loss of enjoyment of life, medical

64

expenses, and financial losses.

273.   WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

## SEVENTH CAUSE OF ACTION

### *NEGLIGENT PER SE*
**(Exactech, Gradisar And Crystal)**

274.   Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

275.   Defendants have an obligation not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, distribution, advertising, preparing for use, warning of the risks and dangers of medical devices.

276.   Defendants' acts described above constitute an adulteration, misbranding, or both, as defined by the Federal Code 21 U.S.C. § 351, 21 U.S.C. § 352, and other applicable FDA regulations, and constitute a breach of duty subjecting Defendants to civil liability for all damages arising therefrom under the theory of negligence *per se*.

277.   Ohio courts have held that a plaintiff may allege a negligence *per se* cause of action against a drug/device manufacturer for failing to comply with FDA regulations.[20]

278.   Furthermore,  physicians and medical care providers are ultimately responsible for

---

[20] See, e.g. *Howard v. Sulzer Orthopedics, Inc.*, 382 Fed. Appx. 437 | 2010 U.S. App. LEXIS 12290 | 2010 FED App. 0367N (6th Cir) | CCH Prod. Liab. Rep. P18,435; *In re Sulzer Hip Prosthesis & Knee Prosthessis Liab. Litig.*, 455 F.Supp.2d 709 | 2006 U.S. Dist. LEXIS 72187; *Kodger v. Zimmer Biomet Holdings, Inc*., 2017 U.S. Dist.LEXIS 161009 | CCH Prod. Liab.Rep.P20,172.

*Sandra Kurt, Summit County Clerk of Courts*

knowing the source, characteristics and fitness of the medical devices they purchase for their patients and ultimately implant in their patients. Physicians and care providers must also ensure that they are purchasing medical devices that are compliant with federal regulations.

279.    Plaintiff, as ultimate end-user of the Defendant's device, is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

280.    Plaintiff, as the prescribee and patient of Gradisar and Crystal is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

281.    As a direct and proximate result of Defendants' breach of the federal statutory requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

282.    Defendants are liable for negligently selling and distributing and prescribing and implanting medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of Ohio law and parallel federal requirements.

283.    WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which the decedent may be entitled to and/or that the court finds is appropriate and/or suitable.

## EIGHTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY
### *(Exactech)*

284.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint

66

as if fully set forth herein and further allege as follows:

285.    Prior to Plaintiff's TKR surgeries, and at all times relevant this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

286.    Defendants expressly warranted the Truliant and Optetrak Devices were safe and effective orthopedic devices.

287.    Defendants promised that the Truliant and Optetrak Devices had excellent long-term clinical outcomes and that "surgeons and patients can have every confidence in the performance and longevity of the [Truliant and] Optetrak knee system."

288.    At the time Defendants manufactured, marketed, sold and/or distributed the Truliant and Optetrak Devices, they knew that the devices were intended for human use, and that Plaintiff was a foreseeable user of the Truliant and Optetrak Devices.

289.    The express warranties represented by Defendants were a part of the basis for Plaintiff's use of the Truliant and Optetrak Devices, and she relied on these warranties in deciding to use the Truliant and Optetrak Devices.

290.    At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Truliant and Optetrak Devices were to be used and warrantied the same to be in all respects safe, effective and proper for such purpose.

291.    The Truliant and Optetrak Devices do not conform to these express representations as demonstrated by the fact that Plaintiff's implants failed prematurely due to polyethylene wear of the tibial insert which necessitated her to undergo multiple revision surgeries.

292.    At the time Defendants marketed, sold and/or distributed the Truliant and Optetrak

67

Devices, Defendants expressly warranted that the total knee replacement systems, including all of their component parts, were safe and merchantable for their intended use.

293. Plaintiff and relied upon Defendants' express warranties.

294. Plaintiff used the Truliant and Optetrak Devices for their intended purpose, and in a reasonably foreseeable manner.

295. The Truliant and Optetrak Devices manufactured and sold by Defendants, did not conform to Defendants' express representations because the Truliant and Optetrak Devices caused serious injury to Plaintiff when used as recommended and directed.

296. As a direct and proximate result of Defendants' acts and omissions, including breach of express warranty, Plaintiff was implanted with the Truliant and Optetrak Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

297. As a further direct, proximate and legal consequence of Defendants' acts and omissions, including breach of express warranty, Plaintiffs have sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; loss of consortium and pain and suffering.

298. Defendants acted intentionally, recklessly and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiff to recover punitive damages.

299. WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, and permanent injury together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which Plaintiff may be entitled to and/or that the court finds is appropriate and/or suitable.

## NINTH CAUSE OF ACTION

### *BREACH OF IMPLIED WARRANTY*
### *(Exactech)*

300.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

301.     Prior to Plaintiff's TKR surgeries, and at all times relevant to this action, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the Truliant and Optetrak Devices for implantation into consumers, such as Plaintiff, by orthopedic surgeons in the United States.

302.     Defendants impliedly warranted, through its marketing, advertising, distributors and sales representatives, that the Truliant and Optetrak Devices were of merchantable quality, and fit for the ordinary purposes and uses for which it was sold.

303.     In fact, the Truliant and Optetrak Devices were not of merchantable quality nor fit for the ordinary purposes and uses for which they were sold and did not meet the expectations of consumers.

304.     The Truliant and Optetrak Devices manufactured and supplied by Defendants were not of merchantable quality and were not fit for the ordinary and/or particular purpose for which patients would expect the components to be properly packaged and stored as to avoid premature degradation of component materials.

305.     Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Truliant and Optetrak Devices were of merchantable quality and safe for their intended and particular use and purpose.

306.     Contrary to such implied warranties, the Truliant and Optetrak Devices were not of

merchantable quality or safe for their intended and particular use and purpose, because Defendants failed to package the polyethylene components of the Truliant and Optetrak Devices in vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH) as to prevent the components from undergoing increased oxidation and causing patients to experience substantial early polyethylene wear, component loosening and/or other failure causing serious complications including tissue damage, osteolysis, and other injuries as well as the need for revision surgery.

307.    As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Plaintiff was implanted with the Truliant and Optetrak Devices and was caused to sustain serious personal injuries, conscious pain and suffering, physical disability, mental anguish, emotional distress, fear, loss of enjoyment of life, medical expenses, and financial losses.

308.    As a further direct, proximate and legal consequence of Defendant's acts and omissions, including breach of implied warranties, Plaintiffs have sustained and will sustain future damages, including but not limited to cost of medical care; rehabilitation; home health care; loss of earning capacity; mental and emotional distress; loss of consortium and pain and suffering.

309.    Defendants acted intentionally, recklessly and wantonly without regard for Plaintiff's rights beyond all standards of decency, entitling Plaintiff to recover punitive damages.

310.    WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, and permanent injury together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief

to which Plaintiff may be entitled to and/or that the court finds is appropriate and/or suitable.

## TENTH CAUSE OF ACTION

### *CONSTRUCTIVE FRAUD*
**(*Gradisar and Crystal Clinic*)**

311.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

312.    Before, during and after Gradisar and Crystal, sold, supplied, prescribed and implanted the Exactech total knee replacement medical devices into Plaintiff and Class Members, Gradisar and Crystal knew and/or should have known that the Truliant and Optetrak total knee replacement medical devices were failing at an unacceptable rate and therefore were misbranded, adulterated and otherwise defective and unfit for implantation into their patients, such as Plaintiff and Class Members. Gradisar and Crystal also knew and/or or should have known, that perspective patients, such as Plaintiff and Class Members, would be strongly motivated to select a different total knee replacement device had they known of (1) the unacceptable failure rate and/or (2) the financial and monetary conflict of interest that Gradisar and Crystal had with Exactech related to the supply, sale, prescription and implantation of the Exactech total knee replacement medical devices.

313.    Gradisar and Crystal represented to Plaintiff and Class Members that the Exactech total knee replacement devices were in Plaintiff's and Class Members' best interests and otherwise concealed the known unacceptable failure rates associated with the Truliant and Optetrak Devices and recommended those devices to Plaintiff and Class Members as being the best alternative for their total knee replacement surgeries.

314.    Plaintiff and Class Members paid Gradisar and Crystal for their total knee replacement surgeries including cost of the respective devices.

Sandra Kurt, Summit County Clerk of Courts

315.     Gradisar and Crystal misrepresented and/or failed to disclose the true characteristics, defects and failures of the Exactech devices.

316.     The characteristics, lack of perceived defects, implied favorable characteristics and lack of failures of the Exactech Devices were material terms to Plaintiff's and Class Members' transactions with Gradisar and Crystal.

317.     Upon information and belief, Gradisar and Crystal falsely, with knowledge of its falsity, or with other disregard and recklessness, misrepresented the true characteristics, defects and failures of the Exactech devices.

318.     Gradisar's and Crystal's actions with regard to the Exactech Devices are fraudulent irrespective of moral guilt because of its tendency to deceive others, to violate public and/or private confidence, and/or to injure public interest.

319.     A special and confidential and/or fiduciary relationship exists between Gradisar and Crystal, and Plaintiff and all putative Class Members.

320.     Constructive fraud does not require proof of fraudulent intent, as the law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence, both public and private.

321.     As a direct and proximate result of Gradisar's and Crystal's constructive fraud, and as a special confidential and/or business relationship exists between Gradisar, Crystal, Plaintiff and putative Class Members, Plaintiff and each Class Member has sustained damages in an amount yet to be determined, but in excess of $25,000.00.

Sandra Kurt, Summit County Clerk of Courts

## ELEVENTH CAUSE OF ACTION

### *FRAUD*
### *(Dr. Ian Gradisar and Crystal Clinic)*

322.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

323.    Defendant Gradisar was at all times relevant hereto an orthopedic surgeon/doctor at Crystal and Plaintiff's treating physician while at Crystal.

324.    Both Gradisar and Crystal had a duty to not defraud Plaintiff and/or her agents, family members and/or representatives and/or misrepresent and/or misstate and/or conceal facts that cannot be characterized as medical in nature.

325.    Conversely, both Gradisar and Crystal owed Grandis a duty to disclose all material facts related to her treatment and not conceal said material information.

326.    Under the facts of this case, and to the extent Defendants' acts are considered to be medical malpractice, Plaintiff's fraud claim is independent of any such alleged medical malpractice due to the purposeful misrepresentation, concealment of material facts and fraud engaged in by Defendants Gradisar and Crystal that include, specifically and without limitation:

a.    At the time Plaintiff was being treated by Gradisar and Crystal and being evaluated for her total knee replacement surgeries, Gradisar and Crystal recommended, encouraged, prescribed and supplied Plaintiff with the Exactech knee replacement total knee replacement Truliant and Optetrak Devices without disclosing and/or otherwise concealing their business and financial relationship they enjoyed with Exactech to promote, use, prescribe and implant Exactech products;

b.    At the time Plaintiff was being treated by Gradisar and Crystal and being evaluated for her total knee replacement surgeries, Gradisar and Crystal concealed their monetary,

73

business and consulting relationship they have with Exactech while simultaneously recommending, encouraging, prescribing, supplying and implanting Plaintiff with the Exactech Truliant and Optetrak Devices with knowledge that, at minimum, the Devices were experiencing unacceptable failure rates an failed to disclose these failure rates, among other things, to Plaintiff, thus denying Plaintiff's ability to have informed consent and an informed choice as to what medical device(s) for her total knee replacement was in her best interest;

c. At the time Plaintiff was being treated by Gradisar and Crystal and being evaluated for her total knee replacement surgeries, Gradisar and Crystal recommended, encouraged, prescribed, supplied and implanted Plaintiff with the Exactech Truliant and Optetrak Devices with knowledge that, at minimum, Gradisar and Gradisar's father, Dr. Ivan Gradisar (also a founder of Crystal), had been engaged by Exactech to perform testing and analysis on the unacceptable failure rates that were being reported to Exactech related to the Optetrak Device (at minimum); and failed to disclose to Plaintiff that both Ian Gradisar and Ivan Gradisar were engaged in the aforementioned testing and analysis related to the Optetrak failures, thus denying Plaintiff's ability to have informed consent and an informed choice as to what medical device for her total knee replacement was in her best interest;

d. Also at this time, Gradisar and Crystal knew that Plaintiff did not have access to the information related to the failure rates and testing and analysis being performed by them (and Dr. Ivan Gradisar), and otherwise had a complete inability to have an informed choice on what medical device to have implanted for her total knee replacement and/or revision regarding same.

Sandra Kurt, Summit County Clerk of Courts

327.   At the time of  Plaintiff's treatment and surgeries related to her total knee replacement and revision surgery regarding same, Gradisar and Crystal knew that there was ongoing reports and testing related to the unacceptable failure rates – and reasons for same – related to the Optetrak Device and also knew that selling, supplying, prescribing and implanting the Optetrak Device into patients, such as Plaintiff, violated the FDA rules and regulations related to misbranded and adulterated nature of medical devices, such as the Optetrak Device.

328.   Gradisar and Crystal were both receiving monetary incentives to sell, supply, prescribe and implant the Exactech total knee replacement medical devices, such as the Truliant and Optetrak Devices, and placed those monetary incentives and personal financial interests above the best interests of their patients, such as Plaintiff.

329.   Gradisar and Crystal also leveraged and took advantage of Plaintiff's inability to know about the ongoing adverse reports, testing and analysis related to the unacceptable failure rates of Exactech' s total knee replacement medical devices such as the Truliant and Optetrak Devices and intended for Plaintiff to rely upon Defendants' misrepresentations, false representations of fact and/or concealment of material facts related to the efficacy, fit, safety and performance characteristics of the Truliant and Optetrak Devices, which Plaintiff justifiably relied upon to her detriment.

330.   This fraudulent act(s) is independent to any alleged medical claim and cannot be characterized as medical in nature, but instead was motivated by and borne out of Gradisar's and Crystal's economic and financial interests. In short, Gradisar and Crystal placed their individual and collective economic and financial interest – and commercial relationship with Exactech -- above the best interest of Plaintiff culminating in the improper sale, prescription, supply and implantation of a misbranded and/or adulterated or otherwise defective total knee replacement medical device(s) resulting in significant damages to Plaintiff.

Sandra Kurt, Summit County Clerk of Courts

331.     As a direct and proximate result of these and other failures acts and omissions by the Defendants, Plaintiff has and will continue to endure great fear, distress, mental anguish, serious physical pains and injuries.

332.     As a direct and proximate result of the fraudulent conduct described above, Plaintiff sustained permanent injury and loss, including but not limited to, conscious pain and suffering disability, and significant medical expenses.

333.     WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, and permanent injury together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which Plaintiff may be entitled to and/or that the court finds is appropriate and/or suitable.

## TWELVTH CAUSE OF ACTION

### *UNJUST ENRICHMENT*
**(*Gradisar, Crystal Clinic and Exactech*)**

334.     Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

335.     Plaintiffs and Class Members conferred a benefit upon Gradisar, Crystal and Exactech by, among other things, providing Gradisar, Crystal and Exactech with financial benefits, payments and renumeration for goods and services related to their total knee replacement surgery and/or revision surgery related to same.

336.     Gradisar and Crystal and Exactech unjustly received money, profits and gains from the sale, advertising and implantation of misbranded and/or adulterated Truliant and/or Optetrak Devices.

337.     Upon information and belief, Gradisar and/or Crystal were also provided financial

*Sandra Kurt, Summit County Clerk of Courts*

incentives and/or monetary payments to promote, prescribe, supply and implant Exactech total knee replacement medical devices such as the Truliant and Optetrak Devices.

338.    Gradisar and Crystal and Exactech knew of the benefits being conferred upon them.

339.    Gradisar and Crystal and Exactech improperly and in bad faith retained the benefit conferred upon them.

340.    Under the circumstances of this case and the actions and/or inactions engaged in by Gradisar and Crystal and Exactech all of which were done in bad faith and/or with ill will, it would be unjust and improper for Gradisar and Crystal and Exactech to retain the benefits conferred upon them jointly and/or severally.

341.    Said injustice can be avoided only by requiring Gradisar and Crystal and Exactech to refund all financial payments and/or incentives paid by Plaintiffs and the Class Members.

342.    Plaintiffs and Class Members seek restitution and disgorgement of all monies and/or profits wrongfully paid to, gained and/or otherwise acquired by Gradisar and Crystal and Exactech as a result of its unlawful conduct and an Order awarding Plaintiffs and Class Members recovery of attorney's fees and costs of suit.

343.    WHEREFORE, Plaintiffs and Class Members demand judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for restitution and/or disgorgement of all monies wrongfully paid to, gained and/or otherwise acquired by Gradisar and Crystal as a result of its unlawful conduct and an Order awarding Plaintiffs and Class Members recovery of attorney's fees and costs of suit.

### THIRTEENTH CAUSE OF ACTION

### *VICARIOUS LIABILITY/RESPONDEAT SUPERIOR*
(*Crystal Clinic*)

344.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint

as if fully set forth herein and further allege as follows:

345.    At all relevant times herein, Dr. Ian Gradisar was an employee, physician, surgeon, paid Exactech Consultant, manager, board member and/or executive at Crystal Clinic, and was under the direct supervision, employ, and control of Crystal Clinic when he and Crystal committed their wrongful, malicious, fraudulent and/or negligent acts described herein.

346.    Dr. Gradisar Ian Gradisar, either by his actions and/or omissions, supervision of actions and/or omissions, and/or knowledge of actions and/or omissions was working in the course and scope of his employment and/or partnership with Defendant Crystal Clinic.

347.    Crystal Clinic granted Dr. Ian Gradisar the authority to perform as an agent, employee, and/or Partner, and held him out to the community, and the Plaintiffs, as fit and competent to perform under the standards of care and professional Rules of Conduct applicable to both Crystal Clinic and doctors licensed to practice medicine in the State of Ohio.

348.    The negligence, malice, and multiple breaches of the standard of care, and wrongful conduct, as alleged herein, were foreseeable and well-known hazards of licensed doctors in the State of Ohio.

349.    As Dr. Ian Gradisar conducted and engaged in his tortious conduct during his employment and Partnership with Crystal Clinic, Crystal Clinic is liable for the negligent, malicious, and wrongful conduct of the individually named Dr. Gradisar, in addition to Crystal Clinics direct corporate liability as alleged herein, under the law of vicarious liability, including the doctrine of *respondeat superior*.

350.    WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, and permanent injury together with costs of

Sandra Kurt, Summit County Clerk of Courts

suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which Plaintiff may be entitled to and/or that the court finds is appropriate and/or suitable.

**FOURTEENTH CAUSE OF ACTION**

***LOSS OF CONSORTIUM AND SERVICES***
***(Gradisar and Crystal)***

351.    Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

352.    At all relevant times, Plaintiff Gregg Grandis was and is the lawfully wedded husband of Plaintiff Laura Grandis, and as such, was and is entitled to the services, consortium and society of Laura Grandis.

353.    As a result of the foregoing causes of action, Plaintiff Gregg Grandis was deprived of the services, consortium and society of Laura Grandis.

354.    As a direct, proximate and legal consequence of Defendants' wrongful conduct as described herein, Plaintiff Gregg Grandis has suffered and will continue to suffer the loss of support, companionship, service, love, affection, society, intimate relations and other elements of consortium all to the detriment of Plaintiffs' marital relationship for which Plaintiff Gregg Grandis is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

355.    WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount more than Twenty-Five Thousand Dollars ($25,000.00) for conscious pain and suffering, medical expenses, loss of enjoyment, and permanent injury together with costs of suit, attorney's fees and expenses, punitive and exemplary damages, and any other relief to which Plaintiff may be entitled to and/or that the court finds is appropriate and/or suitable.

*Sandra Kurt, Summit County Clerk of Courts*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally as follows:

a.  Judgment in favor of Plaintiffs and against all Defendants, jointly and severally, for damages in such amounts as may be proven at trial;

b.  Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, loss of consortium, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

c.  An Order certifying the designated portions of this Complaint as a Class Action and appointing Plaintiff as Class Representative and their counsel as Class Counsel;

d.  An Order for equitable Relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the Injunctive Relief requested herein;

e.  An Order for equitable relief requiring restitution and disgorgement of revenues wrongfully gained and retained as a result of Defendants' wrongful conduct;

f.  Punitive and/or exemplary damages in such amounts as may be proven at trial;

g.  Attorneys' fees and costs;

h.  Interest; and

i.  Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury.

Respectfully submitted,

**SCHNEIDER, SMELTZ, SPIETH
  BELL LLP**

/s/ Thomas J. Connick
Thomas J. Connick (0070527)
1375 East Ninth Street, Suite 900
Cleveland OH  44114
PH: 216-696-4200
tconnick@sssb-law.com
*Attorney for Plaintiffs*

*Sandra Kurt, Summit County Clerk of Courts*